CAPITAL TRANSIT CO.

v.

PUBLIC UTILITIES COMMISSION OF
DISTRICT OF COLUMBIA et al.

No. 11501.

United States Court of Appeals
District of Columbia Circuit.

Decided Dec. 10, 1953.

Order Amending Judgment Filed
Feb. 25, 1954.

Mr. Samuel O. Clark, Jr., Washington, D. C., with whom Messrs. Edmund L. Jones, F. G. Awalt, W. V. T. Justis and F. Keith Kelly, Washington, D. C., were on the brief, for appellant.

Mr. Lloyd B. Harrison, Counsel for the Public Utilities Commission of the District of Columbia, with whom Mr. Vernon E. West, Corp. Counsel for the District of Columbia, was on the brief, for appellee Public Utilities Commission of the District of Columbia.

Mr. T. Justin Moore, Richmond, Va., with whom Messrs. George D. Gibson, Richmond, Va., James Francis Reilly and Cornelius Means, Washington, D. C., were on the brief, for appellee Potomac Electric Power Co. Messrs. H. W. Kelly and Thomas E. O'Dea, Washington, D. C., also entered appearances for appellee Potomac Electric Power Co.

Before STEPHENS, Chief Judge, and WILBUR K. MILLER and FAHY, Circuit Judges.

FAHY, Circuit Judge.

Proceedings were initiated in July 1950 before the Public Utilities Commission of the District of Columbia by the Potomac Electric Power Company for an increase in its rates. The Capital Transit Company, a customer, was permitted to intervene as an interested party.[1] On February 12, 1951, the Commission made its order No. 3762, accompanied by an opinion. It concluded, *inter alia*, that a weighted rate base of $146,926,000 for the test year 1951 constituted a fair and reasonable estimate of the amount upon which the Power Company was entitled to earn a fair and reasonable return in the immediate future, that a rate of return of 5½% was fair and just, and that in order to provide the Power Company with a fair return upon its property devoted to furnishing electric service throughout its system an increase of approximately $2,-600,000 in rates was necessary. It accordingly ordered the Power Company to file rate schedules designed to produce for the system as a whole additional

---

1. For convenience we shall refer to these three parties, respectively, as the Commission, the Power Company, and Transit.

gross operating revenue of not more than that amount annually, based upon the year 1951. By another order, No. 3774, the Commission on March 20, 1951, made effective rate schedules so filed, insofar as they applied to the District of Columbia, finding them to be just, reasonable and nondiscriminatory. The increase for Transit's street railways in the District was approximately $209,000 per annum, to begin April 20, 1951. Transit's application for reconsideration was denied. With other parties it then appealed to the District Court as authorized by § 43–705, D.C.Code 1951. The court dismissed the appeal and affirmed both orders, giving its reasons in an opinion reported *sub nom.* Leeman v. Public Utilities Commission of District of Columbia, D.C., 104 F.Supp. 553. Whereupon Transit, but no other party, appealed to this court as also authorized by said § 43–705.

I. The principal attack upon the rate schedules arises out of the fact that the Power Company serves not only the District of Columbia, to which the Commission's jurisdiction is limited, but parts of Virgina and Maryland where its rates are subject to regulation by other commissions, and also certain interstate consumers the rates for whom are under the jurisdiction of the Federal Power Commission.[2] In approving the increase for District consumers, however, the Commission, as has been noted, did so on the basis of system-wide schedules. It found the rate base of the Power Company by evaluating the total system properties, ascertained its revenue needs also on a system-wide scope, determined

the rate of return required to meet those needs and then approved, for the District alone, rate schedules which, as applied throughout the system, would net the required revenues.[3] Transit points out that the Commission failed to segregate or allocate, terms which we use interchangeably, costs and revenues applicable to the business in the District, separate and apart from those applicable in the other jurisdictions. It contends that, therefore, the rates fixed for the District cannot be said to be "reasonable, just, and nondiscriminatory", the standards prescribed by the local statute. § 43–301, D.C.Code 1951.[4]

Appellees—the Commission and the Power Company—as justification for the system-wide approach point to the highly integrated character of the Power Company, with part of its generating plant located in Virginia yet essential to the total system operations in the District, in Maryland, and interstate. They point also to the relatively compact area served, to the long history of regulation on a system-wide basis, and to the great difficulty which would be encountered in segregating either properties, costs or revenues along jurisdictional lines. These are not mere arguments. They are Commission findings and conclusions with support in the evidence.

In these circumstances it is not always essential in fixing rates for District consumers to segregate properties, costs or revenues merely because the total properties and services of the Power Company extend to other jurisdictions. This conclusion has involved our consideration of decisions of the Supreme Court and of

---

**2.** Those consumers are the Southern Maryland Cooperative, Inc., Virginia Electric Power Company, Consolidated Gas Electric Light and Power Company, referred to as the Baltimore Company, and Pennsylvania Railroad Company. It is not clear that appellees dispute the jurisdiction of the Federal Power Commission over the rates for these services, exclusive of the part involved in interchange arrangements. The further proceedings which will be required will afford opportunity for clarification in this regard.

**3.** The rates in Maryland and Virginia have since been approved, respectively, by the regulatory bodies of those states.

**4.** "[R]easonable, fair, and just" are the standards set forth in § 43–401, and "just and reasonable" in § 43–411 if after the investigation therein contemplated the rates are found to be "unjust, unreasonable, insufficient, or unjustly discriminatory, or to be preferential or otherwise in violation of any of the provisions" therein referred to. See, also, § 43–911.

this court relied upon by Transit to the contrary.[5] The reason given in Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, for separate treatment of the intrastate and interstate aspects of a railroad business in the fixing by a state body of intrastate rates was to avoid the inequity and unreasonableness of interstate traffic bearing more than its due burden in relation to the intrastate. No rational alternative to such separate treatment appears to have been presented as a basis for judging the validity of the state action. To avoid discrimination by the rates of one jurisdiction against those of another—to establish the reasonableness of the intrastate rates to be approved—separation of the property, costs and business involved in the intrastate business was deemed necessary. This purpose has led to the statement that allocation is essential to the appropriate recognition of state and federal authority. See Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 148–149, 51 S.Ct. 65, 75 L.Ed. 255, involving intrastate telephone rates. Minnesota Rate Cases, 230 U.S. 352, 435, 33 S.Ct. 729, 57 L.Ed. 1511, is in the same line of decisions. But thereafter, in Colorado Interstate Gas Co. v. Federal Power Comm., 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206, the principle of segregation of properties was said not to have been written by Congress into the Natural Gas Act as the only prescribed formula for rate regulation. So, too, with respect to the District of Columbia statute. It does not incorporate, as essential, any particular segregation formula; and although a type of segregation was used by the Commission in the proceedings considered in Colorado Interstate Gas Co. v. Federal Power Comm., the opinion of the Court permits a latitude not restricted to segregation of one kind

or another. Illinois Commerce Comm. v. United States, 292 U.S. 474, 54 S.Ct. 783, 78 L.Ed. 1371, and Lone Star Gas Co. v. Texas, 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed. 1304, are we think to similar effect. In the former the Court was reviewing an order of the Interstate Commerce Commission directed at removal of unjust discrimination against interstate commerce due to disparity of the intrastate and interstate switching rates of interstate carriers in the Chicago Switching District. The Court said that where conditions are found to be substantially the same as to all features bearing on the reasonableness of the rate, and the interstate and intrastate classes of traffic are shown to be intimately bound together, separation of interstate and intrastate costs and revenues is not required. In Lone Star Gas Co. v. Texas the Court upheld, without requiring segregation, an order of the Texas commission reducing natural gas rates charged by a Texas utility. The utility had been treated by the commission as an integrated system which included properties in Oklahoma. Chief Justice Hughes, who had written the opinions in Minnesota Rate Cases and Smith v. Illinois Bell Tel. Co., said for the Court:

"* * * This was not a case where the segregation of properties and business was essential in order to confine the exercise of state power to its own proper province. Compare Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 148, 149, 51 S.Ct. 65, 68, 69, 75 L.Ed. 255. Here, as we have seen, the Commission in its method of dealing with the property and business of appellant as an integrated operating system did not transcend the limits of the state's jurisdiction or apply an improp-

5. Cases principally relied upon by Transit are: Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819; Mississippi River Fuel Corp. v. Federal Power Comm., 82 U.S.App.D.C. 208, 163 F.2d 433; San Diego Land & Town Co. v. City of National City, 174 U.S. 739, 758, 19 S.Ct. 804, 43 L.Ed. 1154; Chicago, Milwaukee & St. P. R. Co. v. Tompkins, 176 U.S. 167, 20 S.Ct. 336, 44 L.Ed. 417; Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255; Wabash Valley Electric Co. v. Young, 287 U.S. 488, 53 S.Ct. 234, 77 L.Ed. 447.

er criterion in its determinations. * * * " 304 U.S. at page 241, 58 S.Ct. at page 891.

Where, as in Lone Star Gas Co. v. Texas, it appears the whole of the integrated company, lying in part beyond the commission's jurisdiction, can be considered without interference with other governmental authority or departure from applicable rate-fixing standards, allocation of properties, or of costs or revenues, are not the only formulae available. We are unwilling to attribute to Mississippi River Fuel Corp. v. Federal Power Comm., 82 U.S.App.D.C. 208, 163 F.2d 433, a rigid rule that allocation is essential where the system operates in more than one jurisdiction. There the Commission itself had adopted allocation, within its "wide power in the selection of formulae for the ascertainment of costs." 82 U.S.App.D.C. at page 214, 163 F.2d at page 439. We set aside the order because in applying allocation the Commission had used in part improper measures and had failed to make adequate findings.[6]

■ By reason of the foregoing it seems plain that at least certain steps taken by the Commission on the basis of the system-wide operations of the well integrated Power Company, without allocation of its properties, costs or revenues, withstand attack. These steps include the ascertainment of the rate base itself by inclusion of all its properties. The precedents lead us to conclude that this is not illegal in and of itself, and there is no reason peculiar to this case which renders it illegal in its present application. Mr. Justice Jackson in his concurring opinion in Colorado Interstate Gas Co. v. Federal Power Comm.,

supra, 324 U.S. at page 609, 65 S.Ct. at page 842, said,

" * * * I suppose a commission is free to take evidence as to conditions and events quite beyond its regulatory jurisdiction where they are thought to affect the cost of that whose price it is directed to determine. * * * "

We see no reason why findings on evidence so taken may not also be made, as was done in the case before us, in aid of the process of rate making within a commission's jurisdiction.

■ There likewise appears no basis for disapproving the Commission's use of system-wide revenues and revenue needs as part of the process of reaching the approved rates. As the Commission says, its "authority to fix rates charged for electric service by the Company is limited to the District of Columbia. This does not mean, however, that the Commission must blind itself to the operations of the Company as a whole in appraising its revenue needs. * * * [E]ffective and equitable regulation requires consideration of system operations." No fault with this approach at this further stage, that of ascertaining revenue and revenue needs, is disclosed by any ground presented, once it is held that allocation is not the only method available where more than one jurisdiction are involved.

Furthermore, the fixing of a rate of return does not depend upon or require allocation. The reasonableness of the particular percentage fixed, however, is considered independently hereinafter.

■ We reach this point in the process followed by the Commission without finding error in the system-wide meth-

6. Colorado Interstate Gas Co. v. Federal Power Comm., supra, demonstrates that where allocation is employed there is discretion as to its character, which need not always entail segregation of property: " * * * the appropriateness of the formula employed by the Commission in a given case raises questions of fact, not of law." 324 U.S. at page 590, 65 S.Ct. at page 833. See, also, Mississippi River Fuel Corp. v. Federal Power Comm., supra; Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 118, 188 F.2d 11, 14, certiorari denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686; Washington Gas Light Co. v. Byrnes, 78 U.S. App.D.C. 107, 137 F.2d 547, affirmed sub nom. Vinson v. Washington Gas Light Co., 321 U.S. 489, 64 S.Ct. 731, 88 L.Ed. 883.

od pursued. This leaves undetermined, however, the validity of rates actually approved for District consumers. Here the problem which gave rise to the allocation requirement remains even though that formula may not be the only route to its solution. We must be able to say that the rates in the District are reasonable, just and nondiscriminatory as a part of, or in relation to, the system rates contained in the schedules of the Power Company for areas and services beyond the Commission's jurisdiction; that is to say, that District consumers do not subsidize the non-District, or, indeed, vice versa. See Smyth v. Ames, supra, 169 U.S. at page 541, 18 S.Ct. at pages 431, 432; Colorado Interstate Gas Co. v. Federal Power Comm., supra, 324 U.S. at pages 593–594, 65 S.Ct. at pages 835, 836; Mississippi River Fuel Corp. v. Federal Power Comm., supra, 82 U.S. App.D.C. at page 226, 163 F.2d at page 451. In solving this final problem the continuation of a system-wide treatment is not necessarily excluded. But in order that our review of the rates be not perfunctory, Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 120–121, 188 F.2d 11, 16–17, certiorari denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686, the Commission must make findings, with supporting evidence, which disclose a rational basis for those rates which it approves as part of broader schedules which apply beyond its jurisdiction.[7]

We go to the Commission's opinion in search of findings which give a valid basis for the rates fixed for the District in this context of system-wide rates which apply in Virginia and Maryland and, also, to its interstate services.[8]

■ The Virginia area, and part of the Maryland, are classified by the Commission as urban, as is the whole of the District of Columbia. On this premise appellees contend that where the same conditions prevail beyond as well as within the Commission's jurisdiction the validity of a uniform rate need not be demonstrated by allocation.[9] We think this is essentially true. To paraphrase the language of the Supreme Court in Illinois Commerce Comm. v. United States, supra, where economic conditions in the areas served are found to be substantially the same with respect to all features bearing on the reasonableness of the rate and the areas are shown to be intimately bound together there is no occasion to separate costs and revenues according to jurisdictional lines. But the evidence and findings must bring the situation within these tests if they are to apply. Even were we to assume the evidence would support such findings as to the entire urban zone the Commission itself should first make them on the basis of its own consideration of the evidence. The Commission does refer in its opinion to the fact that the urban zone has been extended from time to time beyond the District of Columbia "as the population density and urban characteristics of the District of Columbia have extended into the Company's Maryland territory."[10] The Commission also states the record indi-

---

7. While this is akin to it is not the same as the problem involved in classifications and differentials among types of consumers, for the latter for one thing do not per se involve separate jurisdictional responsibilities.

8. See n. 2, supra.

9. We need not for present purposes distinguish between the different types of users within the urban area.

10. The inadequacy of this as a finding of similar costs is emphasized when the statement is read in context:
"The area in Maryland served by the Company embraces substantial parts of Montgomery and Prince George's Counties adjacent to the District of Columbia. Exhibit No. 16 of the record shows the service area of the Company as well as the proposed urban and suburban rate zones. The proposed urban rate zone in Maryland is immediately adjacent to the District of Columbia in Montgomery County and in Prince George's County. This so-called urban zone has been extended from time to time over the past several years, beyond the District of Columbia boundary, as the population density and urban characteristics of the District of Columbia have extended into the Company's Maryland territory."

cates that it is desirable and equitable to extend the rates available in the urban zone to both the Virginia territory of the Power Company and to an additional area in Maryland. But we are not justified in translating these general statements either into findings of similarity of costs and revenues throughout the urban zone or into other terms which support the reasonableness of rates in that part of the urban zone comprised of the District of Columbia in relation to the rates in the remainder of the urban zone. We are reviewing in detail a rate order made from a system-wide standpoint without segregation of properties, costs or revenues as between the several jurisdictions within which the system operates. The importance and character of the subject call for findings which reflect the subsidiary and ultimate bases for the action taken, in terms pertinent to rate-fixing, namely, properties, costs and revenues, or costs and revenues, or, if not these then, as indicated in Illinois Commerce Comm. v. United States, supra, other factors by which the reasonableness of the District rates can be judged. Saginaw Broadcasting Co. v. Federal Communications Comm., 68 App. D.C. 282, 96 F.2d 554, certiorari denied sub nom. Gross v. Saginaw Broadcasting Co., 305 U.S. 613, 59 S.Ct. 72, 83 L. Ed. 391, and Tri-State Broadcasting Co. v. Federal Communications Comm., 68 App.D.C. 292, 96 F.2d 564, require such findings, though we are aware of the generous attitude towards findings in rate cases displayed in Colorado Interstate Gas Co. v. Federal Power Comm., supra, 324 U.S. at page 595, 65 S.Ct. at page 836, and inherent in King v. United States, 344 U.S. 254, 73 S.Ct. 259.

█ Furthermore, there is an area in Maryland beyond the urban zone, classified as suburban. This alone accounts for approximately 6% of the business of the Power Company. Neither this nor the percentage of sales under the rate jurisdiction of the Federal Power Commission,[11] is insignificant. Each of these areas of service, and of course their aggregate, is substantial. With respect to the suburban business, the Power Company with the approval of the Maryland commission applies a higher rate there than in the urban zone, due to higher costs, but there is no finding the suburban rate bears such relationship to higher costs as, considered from the standpoint of costs alone or together with other factors the Commission might deem to be relevant, enables us to arrive at a judgment that the District rates are reasonable in this still larger context of system-wide rates.[12] The difficulty is not met by appellees' contention Transit does not attack the fairness of the differential between urban and suburban rates; for it is not merely a question of differential. In fixing the District rates as part of system-wide schedules the Commission must justify the former. The suburban rates necessarily affect those within the District when the District schedules are arrived at as part of system-wide schedules. Revenues become the system revenues. The basic problem is whether rates fixed by the Commission for the District are on a higher level than they reasonably and justly should be due to other sources not bearing their fair share of revenues. We do not now decide whether this is the fact or not. But when the problem lies across jurisdictional lines and is not solved by the permissible formulae of allocating as between jurisdictions either properties, costs and revenues, or costs and revenues, the method which is adopted must be rationally

11. This is aside from the interchange arrangements with the Baltimore Company, treated by the Commission as a production expense.

12. Prior to these proceedings the system included a rural zone in Maryland as well as an urban and as suburban zones there, with rates higher in the suburban than in the urban and higher in the rural than in the suburban. The District of Columbia was classed as entirely urban. The Power Company has now eliminated the rural zone, incorporating it into the suburban.

manifested in findings and conclusions,[13] the former grounded in evidence and the latter in evidence and reasoning, which enable the court to support the District rates alone. The burden upon Transit to sustain its attack upon the orders, see King v. United States, supra, is carried when such findings, essential to adequate review, are lacking. See Mississippi River Fuel Corp. v. Federal Power Comm., supra, 82 U.S.App.D.C. at page 214, 163 F.2d at page 439; Saginaw Broadcasting Co. v. Federal Communications Comm., supra. See, also, Colorado Interstate Gas Co. v. Federal Power Comm., supra, 324 U.S. at page 595, 65 S.Ct. at page 836. The statutory authority of this court to review questions of law implies the necessity for such findings. Washington Gas Light Co. v. Baker, supra. The District rates are not sustained by the circumstance that system-wide treatment of certain factors is permissible, as we hold. Where these rates are arrived at by formulating schedules on a system-wide basis, extending into other jurisdictions, they must be supported also by findings of similar conditions pertinent to rate-fixing where the other rates are similar or, where the other rates are different, by findings of other relevant economic conditions which justify on a rational basis the District rates in relation to the other; that is, as part of the system-wide schedules. If this cannot be done then it would seem necessary to resort to allocation. The other rates here referred to are those in the urban zone in Virginia and Maryland, the suburban zone in Maryland, and those for interstate services exclusive of the interchange arrangements.[14]

II. The Commission allowed a rate of return of 5½% on the rate base. Our function, see Washington Gas Light Co. v. Baker, supra, 88 U.S.App.D.C. at page 118, 188 F.2d at page 14, is to review questions of law and to disturb findings of fact only if they are "unreasonable, arbitrary, or capricious", § 43–706, D.C.Code 1951. Under these standards we held in the case last cited that the rate of return there fixed was not supported by the necessary evidence or inquiry. Without evidence we pointed out the lack of basis for applying any standard, leaving judicial review, though authorized, a futile gesture. Here, however, the writer of this opinion believes there was evidence dealing with the rate necessary to maintain the Power Company in a sound financial position, to permit it to attract additional capital, the cost of capital, and as to the necessity of providing dividends and interest on funded debt. The evidence was discussed and analyzed by the Commission in its opinion. The Commission found that 5½% was reasonable and proper as a rate of return, and that this is sufficient to maintain the Power Company in a sound financial position and to enable it to attract capital as needed in the rendition of efficient and economical electric service to the public, whereas a lower rate basis would jeopardize its ability to issue securities on favorable terms and, accordingly, would be contrary to the public interest.[15] He finds nothing in Mississippi River Fuel Corp. v. Federal Power Comm., supra, or Washington Gas Light Co. v. Baker, supra, relied upon by Transit, which conflicts with the view that, on the record before us, these findings are not unreasonable, ar-

13. The Commission characterizes its ultimate findings as conclusions.

14. The Commission treated the net cost of the interchange services as a production expense, stated to be in accord with the provisions of Production Expense Account 739—Interchange Power, of the Uniform System of Accounts prescribed by the Federal Power Commission and by the Commission itself and adhered to

by the Power Company. Transit has not met the burden of showing this to be erroneous.

15. The fact that the Commission's opinion shows that it took into consideration its knowledge of the financial position of the Power Company since an earlier like finding, does not vitiate its conclusion on the whole record shown to have been considered in this case.

bitrary, or capricious, or so unsupported by evidence as to be legally inadequate. Chief Judge Stephens and Judge Miller, however, are of a different opinion on this Topic II and Judge Miller joins in the views expressed on that topic in the opinion of Chief Judge Stephens which accordingly becomes the opinion of the court on Topic II.

III. The writer and Judge Miller are of the view that, because of the further proceedings required by our disposition of Topic I, it is not now necessary to pass upon the validity of the share of total increase of rates in the District of Columbia required by the Commission to be borne by Transit. The amount of this increase is not yet finally determined. Nevertheless we think it helpful in aid of final disposition of the problem to say now that we agree with Chief Judge Stephens that the findings presently before us are not adequate in respect of the increase assigned to Transit by the orders now under review.

The judgment of the District Court is reversed and the case will be remanded to the District Court with instructions to remand the case to the Commission for further proceedings in accordance with this opinion.

STEPHENS, Chief Judge.

I agree with the reasoning and with the conclusions reached in Topic I of Judge Fahy's opinion. But for the reasons stated below I disagree with the view expressed in Topic II of Judge Fahy's opinion as to the sufficiency of the Commission's findings on the issue as to the rate of return. And for reasons stated below I am also of the view that the discussion of the Commission on the issue as to the amount of the total rate increase to be apportioned to Transit fails to satisfy the requirements of the courts for findings.

*Concerning the findings on the issue as to the rate of return:* The Commission reached the conclusion that a $2,600,000 rate increase should be allowed the Power Company, in the following manner:

The Commission took as an acceptable test period for the purposes of the proceeding the calendar year 1951. The Commission then found—I state its findings in summary form—that:

For the test period a rate base of $146,926,000 is a reasonable estimate of the amount upon which the Power Company is entitled to earn a reasonable return. Existing rates charged for electrical energy would produce during the test period a net operating income of approximately $6,730,000 after giving effect to the applicable federal income tax. That amount represents a return of 4.58 per centum on the rate base of $146,926,000. Such a return is inadequate to maintain the Power Company in a sound financial position and to enable it to attract on favorable terms the capital necessary for the rendering by the Power Company of the public service required of it. A fair rate of return to be applied to the rate base is 5.5 per centum. The total operating income necessary to produce 5.5 per centum on the rate base stated is $8,080,930. That amount exceeds the $6,730,000 which would be produced by existing rates by $1,350,930. In order to realize the latter amount, in view of income tax rates, a $2,600,000 total rate increase is necessary.

It is apparent from the foregoing that the finding that 5.5 per centum is a reasonable rate of return is a critical part of the process by which the Commission arrived at the ultimate rate increase of $2,600,000.

The Commission was applying the so-called prudent investment theory of rate regulation. In so doing it did not follow the requirements which, in my view, have been laid down by this Court of Appeals for the establishment of a reasonable rate of return. In Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 188 F.2d 11 (1950), this court ruled upon such requirements, in respect of the determination by the Commission of a proper rate of return for a gas utility operating in the District of Columbia. There as here the Commission was applying the prudent investment theory of rate regulation. The court said:

"Despite the broad limits allowed the Commission, it remains imperative that its findings, under whatever formula adopted, be based upon substantial evidence in the record. Here, the Commission adopted the prudent investment theory of rate regulation and, at the hearings and in its Findings and Opinion, used the traditional formula for rate-making. That required a determination of the rate base and of a rate of return on that rate base suffi-

cient to produce adequate revenues above operating expenses (including depreciation) to pay interest on the bonds, dividends on the stock and, in general, maintain the financial integrity of the enterprise. Although the Commission did make findings as to rate base and estimated operating expenses as well as probable revenues under the rate schedules proposed, it made no inquiry whatsoever into issues necessary to determination of a fair rate of return. Essential to such an inquiry is a study of the capital costs of the business, such as service on the debt and dividends on the stock, in the light of returns on investments in other enterprises having a similar risk factor. Only upon such evidence can the Commission determine what is required 'to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.' In the Hope case [Federal Power Comm. v. Hope Natural Gas Co.; 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333], the Supreme Court makes abundantly clear the nature of the considerations pertinent to that issue. And, in the 1943 rate proceeding of the Company, the Commission dealt extensively with some of these matters, discussing under 'rate of return' facts regarding long-term debt capital, preferred stock capital and common stock capital. It was this sort of inquiry to which the Supreme Court referred when it said that the standard announced in the Hope case is not 'so vague and devoid of meaning as to render judicial review a perfunctory process. It is a standard of finance resting on stubborn facts'

"The only reference to rate of return in the Commission's opinion is that 'a return of less than 4% is obviously inadequate to maintain the Company in a sound financial position.' Commission expertise alone cannot support so pivotal an assumption. Failure to subject this issue to inquiry at the hearing and the consequent inadequacy of the record and the findings render the Commission's conclusion that the rates are 'reasonable, just, and non-discriminatory' devoid of substance and wholly ineffective for its purpose. Without any evidence on this essential issue, there is no basis for application of any standard and the judicial review authorized by the statute becomes a formal but futile gesture." (Footnotes omitted) (188 F.2d at 15-17)

In the Washington Gas Light case this court dealt also with another requirement. It appeared in that case that the Commission in deciding upon a rate of return had relied upon a finding made on that issue in a prior proceeding involving the same utility. In respect of that the court, immediately after the statement just quoted, said:

"Although the Commission's opinion makes no attempt to explain this fatal deficiency in the record, a review of the transcript indicates that the Commission may have based its action on one or both of two possible grounds:

* * * (2) . . . While under certain circumstances, reliance on a prior proceeding for this purpose might be permissible, such circumstances do not exist in this case. There is nothing before us to indicate that pertinent local conditions and economic conditions generally have remained static during the intervening years. Nor does it appear that the risk factor, so important an element in fixing rate of return, has remained static. On the contrary, it appears to have been materially reduced recently by the change from manufactured to natural gas and by the treatment afforded by the Commission to abandoned plant and standby plant. Finally, the only relatively recent rate proceedings involving this Company dealt with the sliding scale arrangement which presented substantially different considerations." (Footnotes omitted) (188 F.2d at 17)

These rulings by this court in my view require a commission, in reaching a decision as to a reasonable rate of return under the prudent investment theory of rate regulation, to make findings upon the following underlying issues: the return necessary to service the outstanding funded debt, if any, of the utility; the return necessary to service its preferred stock, if such stock is outstanding; the return necessary to attract investors in common stock; the return on funded debts, preferred stock, and common stock in other public utilities having a risk factor similar to that of the utility under consideration; and, if the commission has relied upon a rate of return determined in a previous proceeding involving the same utility, a further finding upon the question whether or not pertinent local conditions, economic conditions generally, and the risk factor have remained static during the intervening period. The requirements thus laid down in the Washington Gas Light case are consistent with the rulings and reasoning of this court in Saginaw Broadcasting Co. v. Federal Communications Comm., 68 App.D.C. 282, 96 F.2d 554 (1938), certiorari denied sub nom. Gross v. Saginaw Broadcasting Co., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391, Tri-State Broadcasting Co. v. Federal Communications Comm., 68 App.D.C. 292, 96 F.2d 564 (1938), and with the rulings of the Supreme Court referred to therein, particularly the rulings in United

States v. Baltimore & O. R. Co., 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587 (1935), and Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931). The decisions require a commission in a quasi-judicial proceeding to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings—this in order that the commission shall itself perform the initial function of evaluating the evidence and deciding the issues of fact, and in order that the courts, as reviewing tribunals, can decide whether or not the ultimate decision reached by the commission follows as a matter of law from the facts found as its basis, and also whether or not the facts found have substantial support in the evidence. The "expertise" of a commission usefully serves it in evaluating the evidence, but that expertise can not supply evidence and can not, without findings made upon the critical issues before it, guide a commission to a rational and lawful decision.

■ It is without dispute in the instant case that the Power Company has an outstanding funded debt, outstanding preferred stock, and that it has issued common stock for the purpose of securing capital. It is without dispute also that the Commission, in determining the issue as to rate of return for the Power Company in the present proceeding, relied upon a rate of return finding made by it in a 1944 proceeding involving the Power Company. It is also without dispute that in the present proceeding, in determining a rate of return, the Commission made no findings upon

the basic issues outlined above. In my view, unless the Commission takes evidence and makes findings upon such issues, it can not itself be assured that its decision on the question as to a reasonable rate of return is rationally, rather than conjecturally, reached and the District Court and this court, as reviewing tribunals, can not determine whether or not the Commission's decision was rationally and lawfully reached.

That the finding requirements above described are not, as contended by the Commission and the Power Company, merely formalistic, is shown by the illustrative tabulation set forth in the margin.[1] The tabulation assumes that evidence and underlying findings might show a fair rate of return to be some percentage between 4.5 per centum and 6.5 per centum, inclusive; the tabulation is otherwise self-explanatory. It demonstrates the need of arriving at a rate of return upon a rational basis, i. e. as a result of evidence and underlying findings upon the issues outlined in the Washington Gas Light case, rather than conjecturally. For example, if the fair rate of return is not 5.5 per centum but 4.5 per centum, the operating income resulting from existing rates is $118,-330 higher than necessary to produce a 4.5 per centum return. Therefore, no rate increase is necessary. On the other hand, if the fair rate of return is not 5.5 per centum but 6.5 per centum the operating income resulting from existing rates is $2,820,190 lower than necessary to produce a 6.5 per centum return. Therefore, a rate increase substantially

1.

| Rate Base | Rate of Return | Needed Operating Income (Rate Base times Rate of Return) | Operating Income at Existing Rates | Resulting Increase Above or Decrease Below Present Operating Income |
|---|---|---|---|---|
| $146,926,000 | 6.5% | $9,550,190 | $6,730,000 | +$2,820,190 |
| 146,926,000 | 6.0 | 8,815,560 | 6,730,000 | + 2,085,560 |
| 146,926,000 | 5.5 | 8,080,930 | 6,730,000 | + 1,350,930 |
| 146,926,000 | 5.0 | 7,346,300 | 6,730,000 | + 616,300 |
| 146,926,000 | 4.5 | 6,611,670 | 6,730,000 | — 118,330 |

higher than that ordered by the Commission is necessary. Obviously, the correctness of the rate of return is of realistic, not formalistic, interest to both ratepayers and the Power Company.

I have considered a contention made by the Commission and the Power Company that the existence of a so-called "sliding scale plan" for the Power Company makes unnecessary the findings required by the Washington Gas Light decision, such a sliding scale plan not having been involved in respect of the utility whose rates were therein considered. I find no merit in that contention. The sliding scale plan, as I understand it, makes provision for the possibility that actual earnings may prove higher or lower than anticipated in view of the rate of return in effect. Under the plan, excess earnings are applied to building up a special reserve account as a protection against insufficient earnings in the future, but when the reserve account reaches 3 per centum of annual revenues any further excess is refunded to consumers. But it is to be noted that the sliding scale plan thus operates in reference to earnings. It is therefore not adapted to protecting rate payers if the rate of return itself is excessive.

I think, therefore, that this court, in reversing and remanding the case to the District Court, should direct that court to remand the case to the Commission and require the Commission to take evidence and to make further findings as above outlined upon the issue of rate of return.

*Concerning the findings on the issue as to the amount of the total rate increase to be apportioned to Transit:* In the Commission's Order No. 3762 it "finds and concludes" that the distribution among the Power Company's consumers of the additional needed revenue of $2,-600,000 should be "substantially" as follows:

| Type of Service | Amount |
|---|---|
| Residential | $ 550,000 |
| Commercial: | |
|   Low voltage | 970,000 |
|   High voltage | 560,000 |
| Street lighting | 265,000 |
| Street railway: | |
|   600-volt service | |
|   A–C service at commercial schedule rates | 230,000 |
| Other | 25,000 |
| | $2,600,000 |

That distribution was premised upon a system basis. The Commission recognized that an exact apportionment to each type of service is not practicable and that some "deviation between classes of service" might be necessary, and in Order No. 3762 it required the Power Company to file for consideration rate schedules in substantial accord with the views expressed in the Commission's "Findings and Opinion" accompanying the order. The rate schedules filed differed to some extent from the tabulation above set forth: the distribution to Street Railway was $223,000, of which $209,000 was apportioned to the District of Columbia and $14,000 to Maryland, none to Virginia; the distribution to Residential was $552,000; to Commercial High Voltage, $559,000; to Street Lighting, $266,000. Commercial Low Voltage remained at $970,000, and Other remained at $25,000.[2] But those differences were obviously insubstantial. The schedules containing the modified apportionments received the ultimate approval of the Commission in its Order No. 3774 as rate increases "just, reasonable, and nondiscriminatory." But those modified apportionments are derivative from the system increase established in Order No. 3762 and must therefore find their support in the Commission's findings and opinion accompanying that order.

Transit urges that the stated dis-

2. I do not state the division as among the District of Columbia, Maryland, and Virginia in respect of the items other than Street Railway for the reason that there is no contest in this case on the part of Residential, Commercial, Street Lighting, or Other consumers.

tribution to Street Railway is not supportable on the present record for lack of basic findings rationally supporting the apportionment. The Commission and the Power Company, to the contrary, contend that less particularity is required in findings underlying a distribution among classes of consumers of a total approved rate increase (of $2,600,000) than is required in findings supporting the total increase itself, and they contend that there is enough in the record in the nature of findings to support the distribution.

The Commission and the Power Company rely, in particular, upon Northern Pac. Ry. Co. v. State of North Dakota, ex rel. McCue, 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735 (1915), and Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). In the first of those cases, it appears that the North Dakota Legislature had fixed maximum coal rates for rail carriers. Two of the carriers affected by the statute refused to put the rates into effect. A mandatory injunction issued at the instance of the State's Attorney General by the Supreme Court of North Dakota compelled compliance notwithstanding a contention by the carriers that the rates were confiscatory. That ruling was affirmed by the Supreme Court of the United States, but without prejudice to the right of the carriers to reopen the proceeding after the rates had been subjected to actual trial. Upon such a reopening, the Supreme Court of North Dakota again entered a judgment commanding the carriers to keep the rates in effect, despite a finding as to one of them that though the rates were slightly remunerative they were not compensatory, and despite a finding as to the other that the rates caused the carrier to suffer a loss on coal haulage. On appeal to the Supreme Court of the United States that judgment was reversed. Thus the decision, at the instance of the carriers affected thereby, actually set aside an individual rate where the facts of record demonstrated that it was non-compensatory. The opinion, by Mr. Chief Justice Hughes, summarized the foundation for the ruling as follows:

"With respect to particular rates, it is recognized that there is a wide field of legislative discretion, permitting variety and classification, and hence the mere details of what appears to be a reasonable scheme of rates, or a tariff or schedule affording substantial compensation, are not subject to judicial review. But this legislative power cannot be regarded as being without limit. The constitutional guaranty protects the carrier from arbitrary action and from the appropriation of its property to public purposes outside the undertaking assumed; and where it is established that a commodity, or a class of traffic, has been segregated and a rate imposed which would compel the carrier to transport it for less than the proper cost of transportation, or virtually at cost, and thus the carrier would be denied a reasonable reward for its service after taking into account the entire traffic to which the rate applies, it must be concluded that the State has exceeded its authority." (236 U.S. at 604, 35 S.Ct. at 436.)

The reliance by the Commission and the Power Company is upon the first sentence of the foregoing statement. But the whole of the statement by the Court evidences that there may be judicial review of the reasonableness of particular rates. In the Mississippi Valley Barge case carriers by land, competing with the Barge Company, a water carrier, filed reduced rate schedules with the Interstate Commerce Commission which approved them in substance. The Barge Company, in a three-judge district court proceeding, sought to set aside the Commission's order on the ground that the reduced rates would subject the company to disastrous competition with the railroads. None of the evidence received by the Commission in the proceeding which resulted in the approval of the rate schedules was presented to the three-judge court. Before that court were merely the report of the Commission and its orders and certain affidavits furnished by the Barge Company as to the effect of the new rates upon its ability to compete. The affidavits were objected to as inadmissible so far as inconsistent with what had been found by the Commission in its report. The three-judge court dismissed the bill of the Barge Company, holding that the findings of the Commission in its report were con-

clusive as to the facts, and that the findings were sufficient on their face to uphold the lowered rates. On appeal to the Supreme Court. the decree of the three-judge tribunal was affirmed. In an opinion by Mr. Justice Cardozo, the Court said:

"The settled rule is that the findings of the Commission may not be assailed upon appeal in the absence of the evidence upon which they were made. Spiller v. A. [Atchison], T. & S. F. Ry. Co. [Yellow Pine], 253 U.S. 117, 125 [40 S.Ct. 466, 64 L.Ed. 810]; Louisiana & Pine Bluff Ry. Co. v. United States, 257 U.S. 114, 116 [42 S.Ct. 25, 66 L.Ed. 156]; Nashville, C. & St. L. Ry. Co. v. Tennessee, 262 U.S. 318, 325 [43 S.Ct. 583, 67 L.Ed. 999]; Edward Hines Trustees v. United States, 263 U.S. 143, 148 [44 S.Ct. 72, 68 L.Ed. 216]; Chicago, I. & L. Ry. Co. v. United States, 270 U.S. 287, 295 [46 S.Ct. 226, 70 L.Ed. 590]. The appellant did not free itself of this restriction by submitting additional evidence in the form of affidavits by its officers. For all that we can know, the evidence received by the Commission overbore these affidavits or stripped them of significance. The findings in the report being thus accepted as true, there is left only the inquiry whether they give support to the conclusion. Quite manifestly they do. The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the Commission by training and experience is qualified to form. Florida v. United States, ante, p. 1 [292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077]. It is not the province of a court to absorb this function to itself. I. C. C. v. Louisville & Nashville R. Co., 227 U.S. 88, 100 [33 S.Ct. 185, 57 L.Ed. 431]; Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 271 [46 S.Ct. 500, 70 L.Ed. 941]; Virginian Ry. Co. v. United States, 272 U.S. 658, 663 [47 S.Ct. 222, 71 L. Ed. 463]. The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." (292 U.S. at 286–287, 54 S.Ct. at 693.)

The Commission and the Power Company rely upon the last three sentences of the foregoing. But the last sentence supports the contention of Transit that there must be *rational* support for the conclusions of the administrative body.

Assuming the validity of the proposition asserted by the Commission and the Power Company that in the determination of individual rates less particularity in findings is required of a commission than in the determination of a total rate increase, nevertheless the authorities make clear that in a quasi-judicial administrative proceeding, the ultimate conclusions of the administrative body must, on every material issue, be reached in a manner demonstrably rational. A commission's ultimate findings, to be valid, must be logically supported by basic findings, themselves established by the evidence presented. This is attested by the cases which I have referred to in the first topic of this opinion, to wit, Saginaw Broadcasting Co. v. Federal Communications Comm., 68 App.D.C. 282, 96 F.2d 554 (1938), certiorari denied sub nom. Gross v. Saginaw Broadcasting Co., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391, Tri-State Broadcasting Company v. Federal Communications Comm., 68 App.D.C. 292, 96 F.2d 564 (1938), United States v. Baltimore & O. R. Co., 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587 (1935), and Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931), to which may be added United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S. Ct. 462, 79 L.Ed. 1023 (1935), and Mississippi River Fuel Corp. v. Federal Power Comm., 82 U.S.App.D.C. 208, 163 F.2d 433 (1947). In the latter case this Court of Appeals recognized the applicability of this proposition even to findings on a highly technical subject. The court reversed for lack of sufficient evidence and findings a decision of the Federal Power Commission in respect of the allocation of compressor station labor costs for the purpose of determining gas rates. Explaining its ruling the court, *inter alia,* said:

"We repeat that the same rules as to substantial evidence and necessary findings apply to technical facts, difficult of ascertainment, as apply to ordinary facts easily found and easily understood. The facts must be found, the findings must be supported by substantial evidence, and the conclusion must in turn be supported by the findings. The allocation of this compressor station labor is not so supported." (163 F.2d at 447)

In its opinion and Order No. 3762 the Commission reaches its conclusion as to the distribution to classes of consumers of the $2,600,000 approved rate increase, including the distribution to street railways of $230,000, upon the basis of a

discussion which may be summarized as follows:

Contractual arrangements between Transit and the Power Company, approved by the Commission, fixed the prices charged Transit for electrical energy since September, 1933.

Transit Exhibit No. 74 shows the estimated cost, new, of Transit property used by the Power Company in supplying electrical energy. Power Company Exhibit No. 83 shows both Power Company property used by Transit and Transit property used by the Power Company. This determination of the property jointly used by the two companies and of the property used by one company and owned by the other is not important in the present proceeding for the reason that the record does not disclose in total the value or cost of such property, "and the resulting influence on rate schedules would be minor. Of more importance is the general consideration of the type and class of service and the volume of use of electricity."

In its schedule of proposed rate increases,[3] the Power Company compared Transit's use of the company's 600-volt service for street railway purposes with that of a consumer of its commercial high voltage service, and then computed the proposed street railway rates in a manner which caused them to exceed the proposed commercial high voltage rates. This comparison and method of computing street railway rates is erroneous because Transit's use of electrical energy for street railway purposes was of such a character—use of electrical energy by a utility—and of such volume—exceeding 20 per centum of total commercial high voltage—that it is more properly comparable to the use of electrical energy sold under contract on a kilowatt-hour basis to other electrical utilities. But that effect is vitiated by the fact that demand rates have been increased so that the net result or total cost is still that of the proposed commercial high voltage schedule plus the conversion charge.

The rates to be used for conversion costs (costs of converting alternating to direct current), expressed in a unit per kilowatt of demand, are based upon readily segregated current costs. Power Company Exhibit No. 20 shows that the total conversion costs borne by the Power Company had been assigned to Transit and that they amounted to $378,000, including overhead charges and a return at 6.08 per centum, and including also approximately $3,500 properly assignable to other 600-volt users. This sum does not reflect costs incident to conversion property which are directly borne by Transit, such as depreciation and taxes, and does not reflect the minor use of Transit distribution facilities in furnishing service to other 600-volt customers. But, since the energy delivered to other such customers was less than 2 per centum of the amount delivered to Transit, any adjustment for such use of Transit's property would be negligible and beyond the limits of accuracy obtainable in the development of rate schedules. Nevertheless, recognition of the fact that the $378,-000 assigned to Transit contains costs of conversion for others and liberal allowances for overhead costs and return, should be given in the development of the per kilowatt rate for conversion chargeable to Transit.

Use by Transit of alternating current is exactly similar to other commercial use, is obtained from the same system as other commercial use, and should be billed at the appropriate commercial schedule for such use.

It is not possible to determine costs of service for each individual user or location for the reason that costs vary by location, season, hour of production, and individual requirements as to demand and use. A cost of service study requested by the Commission, and shown by Power Company Exhibit No. 31, for the purpose of "indicating" why there should be in the present rate consideration such a disparity between increases proposed for street railway and street lighting rates, and the general schedule rates, indicates that there should be a substantial upward revision in the rates to be applied for both street railway and street lighting service. "The costs of service shown by Exhibit No. 31 cannot be, and have not been, used in the development of individual rate schedules. There are, however, certain general considerations which may have a great influence in establishing rates for particular types of service, and such considerations have been weighed as well as the costs of service shown by Exhibit No. 31."

The record shows two general methods of allocating the increased rates to schedule customers, one the so-called Power Company method on a kilowatt-hour basis and the other the Government method of allocation on a revenue basis. Both methods allocated to street railway rates and street lighting rates the full cost of service shown by studies made by the Power Company. But the Power Company's method of using the relationship of kilowatt-

3. The Power Company's schedule of proposed rate increases is as follows:

| Class of Business | Amount | Per Cent. Increase |
|---|---|---|
| Residential | $ 470,000 | 4.3% |
| Commercial Low Voltage | 945,000 | 5.6 |
| Commercial High Voltage | 687,000 | 10.6 |
| Street Lighting | 697,000 | 58.7 |
| Street Railways | | |
| 600 volt D. C. service | 514,000 | 57.8 |
| Commercial A. C. service | 43,000 | 93.5 |
| Other | 23,000 | 6.3 |
| Total | $3,379,000 | 9.2 |

hours furnished to general classes of consumers has the effect of assigning a disproportionately large percentage of the increase to the high voltage and large commercial rate schedules; and the method of allocation on a revenue basis used by the Government, while it would, in effect, maintain the existing dollar relationship between the various schedules, has the effect of loading the small commercial and residential schedules with a higher proportionate amount because of the higher average cost per kilowatt-hour in such schedules.

"From the record before it, the Commission cannot determine a strictly accurate method of assigning the total additional revenue needs by rate schedules, and is not convinced that a strict assignment of the additional revenue would be conducive to equity between rate schedules, because of the many factors involved in the development of the existing schedules which cannot be given full consideration in the method of assigning an incremental amount of rate increase."

A witness for the Power Company stated: "Rate making has been, still is, and probably will be for some time to come, a process of refinement, not necessarily to either increase or decrease the overall revenue of the Company, but to establish just, reasonable, and equitable rates not only for customer groups being furnished with service of different voltage or character, but also to customers of different sizes within the group and even customers having the same consumption, but to whom the cost of furnishing their service may be quite different." This process of refinement can not be accomplished in one step with regard to certain rates such as those for street railway and street lighting, and in progressive steps for other rates, such as the minimum bill and residential charges, all within the same rate structure. Both street railway and street lighting rates presently in effect must be assumed to contain elements of all costs; it is not possible at this time to say that any particular element of the cost of furnishing electricity for these services has been completely absent from the single rate. In the case of street railways, the existing rate must be assumed to contain indeterminate amounts of customer, demand, energy, and conversion costs; other than the conversion cost component, street railway rates should be considered in this process of refinement on the same footing as rates for other classes of service in the distribution of the remaining increment of additional total needs.

"Based upon the foregoing, and after consideration of all the facts of record, including particularly both the kilowatt-hour basis and the revenue basis of allocation, as applied to all classes of service, the Commission finds and concludes that the distribution of the additional needed revenue should be substantially . . . ." as set forth by the Commission [to wit, as in the tabulation set forth at the outset of this topic of the opinion].

In designing new rate schedules the Power Company should bear in mind the view of the Commission that to the extent possible the increase of rates approved should be equitably distributed among customer classes and among customers within each class to the end that decreases in rates to any customer group should be avoided.

Transit has opposed any increase in its rates for electric service and has contended that the Power Company is not in need of any increase in its overall rates for service to the public. That contention is contrary to the record. The record shows also that Transit is not paying a fair price for its electric service. The Commission has no desire to impose such additional charges upon Transit as to make it necessary for Transit to apply for a further increase in its own fares. But to remove the discrimination found to exist in the rates Transit pays requires some increase in charges to it.

"The additional annual charges against Capital Transit Company prescribed by this order in the opinion of this Commission are just and reasonable and will not prove unduly burdensome. Such charges, however, will operate to alleviate a serious deficiency which presently exists in the rate structure of Pepco."[4]

■ In my view the discussion of the Commission above summarized fails to satisfy the requirements for findings laid down in the decisions of this court and of the Supreme Court referred to above. There seems to be no consistent line of reasoning which guided the Commission to its conclusion and no facts found, even informally, from which it follows that street railway rates should be increased by $230,000 on a system basis. Primarily, the Commission appears to rely upon "certain general considerations which may have a great influence in establishing rates for particular types of service" and upon "all the facts of record, including particularly both the kilowatt-hour basis and the revenue basis of allocation, as applied to all classes of service." But the Commission does not specify what the general considerations are or in what manner they aid in the determination of street railway rates, and does not point out

---

4. In addition to the Commission's discussion above summarized, the Commission's opinion and order under the topic "Amount of Rate Increase" discussed Public Street Lighting and Traffic Signal rates, Residential schedules, Commercial Low Voltage schedules and Commercial High Voltage schedules. I do not summarize that discussion since it seems not to be relied upon by the Commission in support of the distribution of rate increase to Transit.

how the kilowatt-hour basis and the revenue basis of allocation as applied to all classes of service result in the ultimate conclusion that there should be a $230,-000 increase in street railway rates. "General considerations" and "all the facts of record" fall far short of satisfying the judicial requirements for underlying findings which by rational inference lead to the ultimate decision that $230,000 is a reasonable distribution to street railway rates.

The infirmity in the Commission's discussion parallels that which was disclosed in Tri-State Broadcasting Co. v. Federal Communications Comm. above referred to. In that case, the Commission had made an ultimate finding that there was a public need for an additional radio broadcasting station in El Paso, Texas, and that public interest, convenience and necessity would be served through a grant of an application for a construction permit for a new station. Two other broadcasting stations were already in operation in El Paso. On appeal, this court reversed the decision of the Commission for lack of a statement of basic facts from which the ultimate fact, in terms of the statutory criterion, could be inferred. On petition for rehearing, the Commission called attention to the fact that it had in its "Statement of Facts and Grounds for Decision" made express findings as to the population of El Paso, as to its size as a trading center, as to its principal businesses and industries and as to the existing radio service. The Commission contended that such findings were sufficient to support its decision that an additional radio station was needed. In denying the petition for rehearing, this court ruled as follows:

"The court did not ignore that part of the Commission's statement; it considered it with care. If proper findings of basic fact logically related to the ultimate question of public need are finally made in the case, the quoted part may prove to have some background or foundational relationship thereto. But it appeared to the court when it considered this material, and it now appears, that it does not logically support the ultimate finding of the Commission, in the language of the statute, that there was public need of an additional station in El

Paso. It does not follow as a matter of inference from the fact that El Paso has in its metropolitan area 118,461 people and, exclusive of the metropolitan area 102,421 people, and that it is a substantial trading center with the various businesses described, and that it has primary radio service from stations KTSM and WDAH and additional primary service from the Mexican stations XEJ, XEFV, XEF, and XEP, and secondary service during nighttime hours, that an additional radio station is needed in El Paso. And we know of no rule of law and of no ruling by the Commission as an expert body that a community of the size and character and having the radio service above described is in need of additional radio service.

"The findings of basic fact which would naturally be expected on the subject of need of an additional station where a community already has radio service would be those concerning the adequacy of the existing service, and in particular in this case concerning the adequacy of the service of the primary stations KTSM and WDAH. The existing radio service might be inadequate in financial stability, equipment, or management; or it might be adequate in such respects and still be inadequate in the sense that the stations, although operating at full capacity, are unable to supply the demands of advertisers and performers in the community. The Statement of Facts and Grounds for Decision on the part of the Commission contains no finding that the existing service is inadequate in any such particulars as are above mentioned. If there is evidence in the record warranting findings of inadequacy of the present service the Commission should make and state such findings. It was the intention of Congress in requiring findings of fact that the Commission should disclose the facts which cause it to reach its decision, and that it should not reach a decision without facts."

Likewise in the instant case: If findings of basic facts are later made in this case from which there rationally follows the ultimate finding of the Commission that of the $2,600,000 total rate increase for the Power Company $230,-000 should be distributed to street railways and that that amount as an increase of rates is reasonable, just, and non-discriminatory, the discussion of the Commission above summarized may prove to have some background or foundational relationship thereto. But the discussion as it now stands does not rationally support the Commission's ultimate finding.

In the brief filed by the Commission and the Power Company in the instant case, it is attempted to justify the Commission's ultimate finding by three different computations based in part upon figures included within the discussion summarized and in part upon figures

taken from other portions of the record. But these computations appear to be attempted explanations, *post hoc*, of how the Commission *may* have reached the distribution of the $230,000 increase to street railway rates. There is again an absence of findings of basic facts which would, in view of the computations, rationally support the ultimate decision.

In my view, the whole of the discussion of the Commission and all of its allusions to evidence, whether in its opinion and Order No. 3762 or in the brief of the Commission and the Power Company, no more logically support the allocation of $230,000 of the total rate increase to street railways than they would support the allocation thereto of $130,000, or of $330,000, or of some intermediate amount, with the difference distributed to the other classes of services enumerated in the Order.

The ultimate requirement of the pertinent statute in the instant case is that the charge made by a public utility shall be "reasonable, just, and nondiscriminatory." D.C.Code 1951, § 43–301. I think the court can not support as reasonable a rate increase allocation for which no understandable reason is shown.

### Order Amending Judgment Filed February 25, 1954

Upon consideration of appellant's motion to clarify opinion and modify judgment, and for other relief, and of the appellees' answer to said motion, and of appellant's reply thereto, it is

▮ Ordered by the Court that the judgment of this Court entered herein December 10, 1953, be, and it is hereby, amended to read as follows:

This cause came on to be heard on the transcript of the record from the United States District Court for the District of Columbia, and was argued by counsel.

On consideration whereof, it is ordered and adjudged by this Court that the judgment of the said District Court appealed from in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said District Court with instructions to enter a judgment:

(1) directing Potomac Electric Power Company immediately to segregate on its accounts all amounts collected from the Capital Transit Company by reason of the rate increase authorized by Orders No. 3762 and No. 3774 of the Public Utilities Commission of the District of Columbia, without obligation to pay the same to the Capital Transit Company unless and until required to do so as a consequence of further order or proceedings pertaining thereto;

(2) directing that henceforth Capital Transit Company, on such dates as the rate increase would be paid if the amount thereof were finally determined to be due, segregate on its accounts amounts equivalent to the said increase, without obligation to pay the same to the Potomac Electric Power Company unless and until required to do so as a consequence of further order or proceedings pertaining thereto; and

(3) remanding the case to the Commission for further proceedings in accordance with the opinion of this Court dated December 10, 1953.

It is further ordered by the Court that in all other respects the motion to clarify and modify the judgment of this Court be and hereby is denied, without prejudice to renewal of such matters by appropriate proceedings in the District Court in the event further proceedings therein are had after proceedings before the Commission on remand in accordance with subparagraph (3) above.

This order is entered without prejudice to the entertaining by the District Court of an application for other relief consistent with this order.

STEPHENS, Chief Judge, filed a statement of his views with reference to the entry of the foregoing order.

FAHY, Circuit Judge, also filed a statement.

Statement of Chief Judge STEPHENS' views with reference to the entry of the order of the Court on appellant's motion to clarify opinion and modify judgment.

STEPHENS, Chief Judge.

In my view the opinion and judgment of this court should not, as prayed by Capital Transit Company, be modified in such manner as to declare that the Commission's orders which are under review are void, as distinguished from erroneous. The opinion and judgment, in reversing the judgment of the District Court—which affirmed the orders of the Commission—make clear that this Court of Appeals pronounces the orders of the Commission erroneous. The orders ought not be declared void because the judgment of a court or commission is not void, as distinguished from erroneous, if the necessary parties are before it, the proceeding is of a kind or class which the court is authorized to adjudicate and the claim set forth in the pleading invoking the tribunal's action is not obviously frivolous. United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308 (1923); Cooper v. Reynolds, 10 Wall. 308, 19 L.Ed. 931 (U.S.1870); De Benque v. United States, 66 App.D.C. 36, 85 F.2d 202, 106 A.L.R. 839 (D.C.Cir.1936); Brougham v. Oceanic Steam Navigation Company, 205 F. 857 (2d Cir.1913); Hughes v. Cuming, 165 N.Y. 91, 58 N.E. 794 (1900); Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1934); cf. United States v. United Mine Workers, 330 U.S. 258 (1947) and cases cited therein at page 293 in footnote 58, 67 S.Ct. 677, at page 696, 91 L. Ed. 884. It has not been contended in this case, and it is not the fact, that the necessary parties were not before the Commission or that the proceeding before it was not of the kind or class with which it is empowered to deal, or that the claim of Potomac Electric Power Company for rate increases was frivolous. I therefore agree with the terms of the order of the court on appellant's motion to clarify the opinion and modify the judgment in so far as those terms omit to declare that the Commission's orders are void, as distinguished from erroneous.

But as to restitution of monies paid Potomac Electric Power Company by Capital Transit Company under the erroneous Commission orders, and as to matters incidental to restitution, such as segregation by Potomac Electric Power Company on its accounts of amounts collected from Capital Transit Company under the erroneous Commission orders, and such as segregation by Capital Transit Company on its accounts of amounts which may ultimately be found to be payable by it to Potomac Electric Power Company, I think this court should make no present ruling or order, other than a remand to the District Court for consideration and disposition, either upon appropriate *sua sponte* issuance of an order to show cause or upon an appropriate motion or in an appropriate independent suit. The disposition of a claim for restitution may well involve issues of fact and law, conflicting equities, and problems of legal and administrative policy. These can best be dealt with and disposed of initially by the District Court, in view of its facilities for hearing witnesses, making reference to to a master, and the like, with right of review ultimately in this court. This method of dealing with the claim for restitution is, I think, in accord with the authorities on the subject. Restitution may be ordered by the court of appeals itself, either directly, Restatement, Restitution, Section 74, Comment (a) (1937), cf. McFadden v. Swinerton, 36 Or. 336, 59 P. 816, 62 P. 12 (1900), or by directing the trial court to award restitution in a sum stated, cf. Cox v. Dixie Power Co., 81 Utah 94, 16 P.2d 916 (1932), or by directing the trial court to award restitution of such amount as had

erroneously been paid, cf. Morris and Johnson v. United States, 7 Wall. 578, 19 L.Ed. 281 (U.S.1867). The trial court itself has power to order restitution in an independent suit, Carroll v. Draughon, 173 Ala. 338, 56 So. 209 (1911), or upon a motion filed in the original proceeding, Baltimore & O. R. Co. v. United States, 279 U.S. 781, 49 S.Ct. 492, 73 L.Ed. 954 (1929); Northwestern Fuel Co. v. Brock, 139 U.S. 216, 11 S.Ct. 523, 35 L.Ed. 151 (1891); see also Restatement, Restitution, cit. supra. But while reviewing courts have power to direct that restitution be made, they rarely exercise that power; the duty of taking and authorizing such steps as may be necessary to the enforcement of rights of restitution is usually confided to the trial court whose judgment is reversed. Maxwell v. Jacksonville Loan & Improvement Co., 45 Fla. 468, 471, 34 So. 255, at 269 (1903); Andrews v. Thum, 71 F. 763 (1st Cir.1896), cf. Aetna Ins. Co. v. Hyde, 327 Mo. 115, 34 S.W.2d 85 (1930); see also Reilly v. State, 119 Conn. 217, 223, 175 A. 582, 585 (1934); 3 Am.Jur., Appeal and Error, Sections 1250, 1251; 14 Cyc.Fed.Proc. (3d Ed.) Sec. 68.113, p. 511. In view of the ruling of the Supreme Court in Atlantic Coast Line R. Co. v. Florida, cit. supra [295 U.S. 301, 55 S.Ct. 717] that restitution upon the reversal of a judgment " * * * is not of mere right. It is ex gratia, resting in the exercise of a sound discretion * * * ", I think that the order concerning restitution made by this court in Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 188 F.2d 11 (D.C.Cir. 1951) does not forbid such a remand as I above suggest.

FAHY, Circuit Judge.

In view of the statement of Chief Judge STEPHENS on the question of modifying our judgment it might be helpful to explain briefly the reason why I have joined with Circuit Judge Miller in approving our order of this date, with particular reference to segregation of amounts involved in the rate increase authorized by Orders No. 3762 and No.

3774 of the Public Utilities Commission. Our order makes no final disposition of these amounts, as we deem it wise that final judicial decision await the further administrative proceedings required. Since, however, it is by action of this court rather than of the District Court that the orders of the Commission have been held erroneous, it seems to me that we, who have been applied to, should take responsibility for indicating the kind of segregation which appears appropriate. As our order states, it is without prejudice to other action by the District Court should occasion therefor arise.