AMERICAN SMELTING AND REFIN-
ING COMPANY et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent (two cases),

Tucson Gas & Electric Company, et al.,
Intervenors.

SAN DIEGO GAS AND ELECTRIC
COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Johns-Manville Products Corp., et al.,
Intervenors.

PACIFIC GAS AND ELECTRIC COM-
PANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

General Motors Corporation et al.,
Intervenors.

SOUTHERN CALIFORNIA GAS COM-
PANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

General Motors Corporatoin et al.,
Intervenors.

SOUTHERN CALIFORNIA EDISON
COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Tucson Gas and Electric Co. et al.,
Intervenors.

AMERICAN SMELTING AND REFIN-
ING COMPANY et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

El Paso Natural Gas Co. et al.

CITY OF WILLCOX and Arizona Electric
Power Cooperative, Inc.,
Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

American Smelting and Refining
Co. et al., Intervenors.

SOUTHERN UNION GAS COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

American Smelting and Refining Co., et al.
Intervenors.

DEPARTMENT OF WATER AND POW-
ER OF the CITY OF LOS ANGELES,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Shell Oil Company et al., Intervenors.

Nos. 72–2204, 73–1016, 73–1040, 73–1042,
73–1050, 73–1102, 73–1116, 73–1148,
73–1152.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 20, 1973.

Decided Jan. 21, 1974.

Rehearing Denied in Nos. 73–1016, 73–
1040, 73–1042, 73–1116, Feb. 25, 1974.

Fahy, Senior Circuit Judge, filed a concurring opinion.

K. R. Edsall, Los Angeles, Cal., for petitioner in No. 73–1042, also argued for petitioners in Nos. 73–1016, 73–1040, 73–1050 and 73–1152.

Robert J. Haggerty, Washington, D. C., with whom Arthur S. Grenier, Dallas, Tex., Charles E. McGee and John T. Ketchom, Washington, D. C., were on the brief for petitioner in No. 73–1148 and intervenor Southern Union Gas Co.

Arnold D. Berkeley, Washington, D. C., with whom George Spiegel, Washington, D. C., was on the brief for petitioner in No. 73–1116.

George W. McHenry, Jr., Acting Sol., Federal Power Commission with whom Leo E. Forquer, Gen. Counsel and Platt W. Davis, III, Atty., Federal Power Commission were on the brief for respondent. Gordon Gooch, Gen. Counsel, Washington, D. C., at the time the record was filed also entered an appearance for respondent in No. 73–1116.

Edward J. Grenier, Jr., Washington, D. C., with whom Richard Noland and Richard J. Pierce, Jr., Washington, D. C., were on the brief for intervenors, General Motors Corp. and Johns-Manville Products Corp.

Jerome Ackerman and James R. McCotter, Washington, D. C., were on the brief for petitioners in Nos. 72–2204 and 73–1102 and intervenor, American Smelting and Refining Co. and others.

Sherman Chickering, C. Hayden Ames and David R. Pigott, San Francisco Cal., were on the brief for petitioner in No. 73–1016 and intervenor San Diego Gas and Electric Co. Donald J. Richardson, Jr., San Francisco, Cal., also entered an appearance for intervenor San Diego Gas and Electric Co. in Nos. 72–2204, 73–1040, 73–1042 and 73–1050.

Rollin E. Woodbury, Alan M. Nedry, Rosemead, Cal., Edward C. Farrell and Arthur T. Devine, Deputy City Atty., Los Angeles, Cal., were on the brief for petitioner in No. 73–1050.

Frederick Searls, San Francisco, Cal., entered an appearance for petitioner in No. 73–1040 and intervenor Pacific Gas and Electric Co. in Nos. 73–1102 and 73–1148. Daniel E. Gibson, Oakland, Cal., also entered an appearance for intervenor Pacific Gas and Electric Co. in No. 73–1102.

John P. Mathis, J. Calvin Simpson and Lawrence Q. Garcia, San Francisco, Cal., were on the brief for intervenors, The People of the State of California and the Public Utilities Commission of the State of California in Nos. 73–1016, 73–1040, 73–1042 and 73–1050.

Thomas F. Brosnan, Washington, D. C., and Lawrence V. Robertson, Jr., Las Vegas, Nev., were on the brief for intervenor Tucson Gas and Electric Co. in Nos. 72–2204, 73–1016, 73–1040, 73–1042, 73–1050, 73–1148 and 73–1152.

C. Frank Reifsnyder, Washington, D. C., was on the brief for intervenors, El Paso Natural Gas Co.

John William Whitsett and Edward Farrell, Los Angeles, Cal., were on the brief for intervenor Air Polution Control District of the County of Los Angeles in No. 73–1152.

Thomas G. Johnson, Houston, Tex., entered an appearance for intervenor, Shell Oil Co. in Nos. 72–2204, 73–1016, 73–1040, 73–1042, 73–1050, 73–1102 and 73–1152. Dan A. Bruce, Houston, Tex., also entered an appearance for intervenor Shell Oil Co. in No. 73–1050.

Charles H. McCrea, Las Vegas, Nev., entered an appearance for intervenor Southwest Gas Corp. in Nos. 72–2204, 73–1016, 73–1040 and 73–1042. Leonard L. Snaider, Las Vegas, Nev., entered an appearance for intervenor Southwest Gas Corp. in Nos. 73–1050, 73–1102 and 73–1148 and intervenor Southern Gas Corp. in No. 73–1152.

Richard H. Silverman, Phoenix, Ariz., entered an appearance for intervenor Salt River Project Agricultural Improvement and Power Dist. in Nos. 72–2204, 73–1016, 73–1040, 73–1042 and 73–1050.

Richard M. Merriman, Washington D. C., entered an appearance for intervenor Arizona Public Service Co. in Nos. 72–2204, 73–1016, and 73–1040. Peyton C. Bowman, III, Washington, D. C., also entered an appearance for intervenor Arizona Public Service Co. in Nos. 72–2204, 73–1016, 73–1040 and 73–1116.

Henry F. Lippitt, Los Angeles, Cal., entered an appearance for intervenor Nevada Industrial Customers in No. 73–1042.

Before FAHY, Senior Circuit Judge, and TAMM and MacKINNON, Circuit Judges.

TAMM, Circuit Judge:

We are called upon to review orders of the Federal Power Commission which establish a temporary curtailment plan for use on the Southern Division System of the El Paso Natural Gas Company. The temporary plan was approved on October 31, 1972 and will remain in effect until the Commission approves a permanent plan.[1] The purpose of a curtailment plan is to provide procedures for the allocation of gas among customers during periods of gas shortage. Much of the difficulty encountered in formulating such procedures for the El Paso system arises from the variety of customers it serves. The two California customers, Southern California Gas Company (SoCal) and Pacific Gas and Electric Company (PG&E) are partial requirements customers, i. e. El Paso is only one of the sources from which they obtain gas supplies. The customers situated in the southwestern states east of California, on the other hand, are full requirements customers. Many, if not all, of the service contracts between El Paso and its east-of-California (EOC) customers require El Paso to supply all gas requirements up to a stated daily maximum.[2] In the past, the EOC customers have borne the entire burden of service curtailments. Neither of the California customers had ever experienced any reduction of service from El Paso under former curtailment plans.[3] Not surprisingly, the alignment of the parties before us reflects this difference between the two categories of customers. The California customers object strongly to various aspects of the temporary plan. The EOC customers generally support the temporary plan although they, too, oppose certain features.

## I. BACKGROUND

On April 15, 1971, the Commission issued Order No. 431, a statement of general policy. Citing recently experienced natural gas shortages,[4] the order required jurisdictional pipeline companies to take all steps necessary for protection of reliable and adequate gas service.[5] Any pipeline which expected that curtailment of service might be necessary was ordered to file tariff sheets setting forth a curtailment plan. Several months after order 431 was issued, El Paso filed proposed tariff revisions which modified the provisions in El Paso's FPC Gas Tariff governing curtailments in El Paso's Southern Division System. This matter is still pending be-

---

1. The interim plan was originally supposed to expire on October 31, 1973 unless a permanent plan was approved before then. On October 18, 1973, however, the Commission extended the operation of the interim plan pending further action on a permanent plan.

2. J.A. at 735, 740, 746, 751, 757, 763, 769 and 776.

3. J.A. at 343–44, 353 (Testimony of Mr. Travis Petty).

4. Although the parties seem to agree that there is a serious shortage of natural gas, we make no assumption on this point. We pause, however, to note the following advertisement which appeared at page 23 of the Wall Street Journal on October 26, 1973: "Natural Gas—Long Term Supply Available —50 Billion Cubic Ft.—We can provide a 15 year supply at 10 million cubic ft. per day."

5. The order is codified at 18 C.F.R. § 2.70 (1973).

fore the Commission and no final order has been issued.

During the proceedings on the proposed revisions, however, El Paso filed a motion requesting the Commission to prescribe interim emergency curtailment procedures to be followed until the issuance of its final order. Although hearings regarding the proposed permanent plan had already been completed, they were reconvened for the limited purpose of ascertaining the need for interim curtailment procedures. Following ten days of hearings, the matter was submitted directly to the Commission, bypassing intermediate decision by the Administrative Law Judge. On October 31, 1972, the Commission issued Opinion No. 634, which (i) declared that the curtailment provisions of El Paso's tariff then in force were discriminatory and violative of the Natural Gas Act and (ii) established a temporary curtailment plan to be followed in El Paso's Southern Division until October 31, 1973 or the issuance of a final order in the proceedings, whichever should occur earlier.[6] This order and a later clarifying order are the subject of the present petitions for review.

## II. THE COMMISSION'S ACTION

In Opinion No. 634 the Commission found that, in the event of a gas shortage, El Paso's existing tariff provisions called for complete cut-off of all EOC customers, including residential and small commercial customers, before any service to California would be curtailed.[7] Thus, even industrial users in California would have priority over EOC residential users. After concluding that these provisions were discriminatory and violative of sections 4 and 5 of the Natural Gas Act, the Commission further found that an interim curtailment plan should be adopted based upon the following schedule of priorities:

Priority 1. Residential, small commercial (less than 50 Mcf on a peak day) and residential needs associated with industrial requirements served directly or indirectly.

Priority 2. Large commercial requirements and industrial requirements for plant protection, feedstock and process needs.

Priority 3. All industrial requirements not specified in Priorities 2, 4 and 5.

Priority 4. Industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where existing alternate fuel capacity is present.

Priority 5. Industrial requirements for large volume (in excess of 3,000 Mcf per day) boiler-fuel use where existing alternate fuel capability is present.[8]

Under the interim plan, delivery reduction in each subordinate category must be complete before deliveries for higher priority requirements are curtailed. The stated purpose of the plan is twofold: "(1) to protect deliveries for residential and small volume commercial consumers who cannot be safely curtailed on a daily basis and (2) to require, as the initial level of curtailment, reduction in deliveries for large volume boiler fuel applications where alternate fuels are available."[9] Following the issuance of Opinion 634, a number of parties requested stays, clarification, modification and rehearing. On December 15, 1972, the Commission issued Opinion 634–A, denying the requests for stay,

---

6. The expiration date has been changed. See note 1, *supra*.

7. According to the Commission's findings, the former tariff provisions required El Paso to curtail its customers in the following sequence (J.A. at 136):
 (a) best efforts gas; (b) irrigation gas; (c) direct industrial gas; (d) industrial gas of distributors east of California (EOC); (e) commercial gas of distributors EOC; (f) residential gas for distributors EOC; (g) gas sales to California customers under Rate Schedule G.

8. J.A. at 144.

9. J.A. at 143–44.

modification and rehearing and clarifying the earlier opinion on several points.

Various parties have challenged the authority of the Commission to prescribe the interim curtailment plan, the adequacy of the fact findings upon which the plan is based and the appropriateness of the remedy it has adopted. Although we conclude that the Commission has the authority to implement interim curtailment plans pending final approval of permanent tariff provisions, we are compelled to remand this matter to the Commission because of certain defects in the orders now under review.

### III. THE COMMISSION'S AUTHORITY

■ The authority of the Federal Power Commission to regulate service curtailments by natural gas pipelines has been sustained by the Supreme Court in FPC v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). The narrow question in that case was whether the FPC has jurisdiction to regulate curtailment of service to direct sales customers (as opposed to customers who purchase gas for resale). In deciding this issue in favor of the Commission, the Court provided broad guidance as to the scope of the Commission's authority. The Court found that the Commission's power to regulate curtailments is derived from two provisions of the Natural Gas Act: section 1(b), which makes the Act applicable to "the transportation of natural gas in interstate commerce," and section 16, which gives the Commission broad enforcement powers:

> The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.

Id. at 638, 642, 92 S.Ct. at 1839. The Court also pointed out that the substantive standard for regulation of service curtailments is found in section 4(b) of the Act. Id. at 642, 92 S.Ct. 1827. That section provides:

> No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

The general authority of the Commission to regulate curtailment plans is not questioned by the petitioners and intervenors. It is argued, however, that the Commission has exceeded this authority in issuing Opinions 634 and 634–A. This contention is directed to substantive features of the opinions as well as the procedure whereby they were issued.

#### A. Interim Orders

■ As explained above, the orders under review are interim orders. An interim order is one entered during the course of proceedings which resolves some of the issues while leaving others to be determined at a later time. The use of interim orders is a well established practice in rate proceedings. FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 583–585, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); FPC v. Tennessee Gas Co., 371 U.S. 145, 154, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962). Although we are not aware of any case testing the use of this device in a curtailment proceeding, Supreme Court dicta indicates that it is perfectly proper. In Louisiana Power & Light Co., supra, the Court discussed the alternative Commission procedures available for regulation of curtailment plans. Noting the delay inherent in the section 5 procedure, the Court observed:

> Of course, even when conducting a § 5 hearing, the Commission would have emergency authority to issue interim orders effecting a curtailment plan.

406 U.S. at 644 n.18, 92 S.Ct. at 1840. (citation omitted). While this footnote mentions only the use of interim orders in section 5 proceedings, the technique has also been approved in proceedings under section 4, FPC v. Tennessee Gas Co., 371 U.S. 145, 154, 83 S.Ct. 211, 9 L. Ed.2d 199 (1962). The fact that the instant proceedings were originally initiated under section 4 has no bearing on the Commission's authority to promulgate the interim orders.

The briefs reveal some confusion as to the precise basis and extent of the Commission's authority to issue interim orders. It is suggested by some parties that the Commission was exercising "emergency authority"[10] and that the interim orders were only justified to the extent necessary to meet anticipated human needs shortages.[11] We think it is important, at the outset, to correct this misunderstanding of the Commission's authority.

The Commission's power to promulgate an interim curtailment plan is not born of emergency. Rather, it is based upon the statutory authorization to perform "any and all acts" necessary or appropriate for the implementation of the Natural Gas Act. As we have stated before, of course, section 16 does not itself grant independent powers but merely provides for implementation of the core sections of the Natural Gas Act. Texaco, Inc. v. FPC, 154 U.S.App.D.C. 168, 474 F.2d 416, 420 (1972), cert. granted, 414 U.S. 817, 93 S.Ct. 119, 38 L.Ed.2d 49 (1973). The "core section" underlying the orders now before us is section 5(a) which empowers the Commission, on its own motion, after hearing, to correct discriminatory practices by natural gas companies. Like any order issued pursuant to section 5(a), an interim order can only issue after full hearing and must include a statement of reasons based upon findings of fact which are supported by substantial evidence in the record. No emergency can excuse these procedural requirements.

This is not to say that the exigencies of a gas supply shortage are completely irrelevant. The threat of a heating-season shortage such as that discussed in the briefs would be relevant to at least two determinations which the Commission must make: (1) whether an interim curtailment order is necessary and (2) whether a particular interim plan is just and reasonable. If, for example, there were no expectation that gas shortages would occur before a permanent plan could be formulated, then an interim order might be unnecessary, even though the existing curtailment regulations may be clearly discriminatory. Similarly, once it becomes necessary to adopt interim curtailment procedures, a plan which might not meet the "just and reasonable" standard if proferred as a final order might be acceptable as a temporary measure in light of the emergency. In short, the existence of an emergency is a factor to be considered by the Commission and by this court upon judicial review. It does not create special powers in the Commission, however, nor does it abrogate the usual procedural requirements for valid administrative action.

### B. *Abrogation Of Contract Rights*

One of the most persistent objections to the Commission's curtailment plan is that it disrupts the contractual relations of the parties. The California customers point out that they have negotiated for and received firm commitments from El Paso, whereas the service to EOC customers is, by the terms of their contracts, subject to curtailment.[12] The new curtailment plan, however, requires all of El Paso's customers to share ratably the burden of any future gas shortage. According to the Califor-

---

10. San Diego Br. at 22; FPC Br. at 33.

11. Edison Br. at 18; San Diego Br. at 20–23; SoCal Br. at 9; Willcox Br. at 44.

12. This interpretation of the El Paso service contracts is not undisputed. *See* Brief of Intervenors American Smelting and Refining Co. et al. at 2–9.

nia customers, this deprives them of the protection from service interruptions for which they have contracted and provides a windfall to less diligent customers east of California. The short answer to this argument is that the Commission is not bound by agreements among parties subject to its jurisdiction. Section 5(a) of the Act gives the Commissioner authority to override discriminatory contractual arrangements:

> (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. . . .

In issuing Opinions 634 and 634–A, the Commission was clearly acting within this provision.[13] Having found that then existing curtailment procedures for El Paso's Southern Division were discriminatory, the Commission was authorized to promulgate substitute procedures. To the extent that the illegal curtailment plan was reflected in customer service contracts, such contracts were also superseded by the Commission's orders.

■■ Several of the parties concede the Commission's authority to override contractual arrangements, but argue that the opinions now under review lack certain threshold findings which, they say, are a condition precedent to the ex-

ercise of that authority. These parties rely chiefly upon the following passage from International Paper Co. v. FPC, 476 F.2d 121, 128 (5th Cir. 1973):

> It must be recognized that there are two quite difficult determinations that the FPC must take before it can abrogate terms in private contracts even accepting the most favorable reading that the claimed power can be given. First, we feel it is incumbent on the agency to give clear reasons why it has determined that these substitute fuel clauses are indeed "undue preferences" within the meaning of that term in the Natural Gas Act.
>
> . . . .
>
> Secondly, we feel that the FPC must make findings and set forth its reasons for holding that abrogation of these clauses is "in the public interest." The FPC must show that the recognized public interests in freedom to contract and contract stability are outweighed by the public interest it seeks to assert under the Natural Gas Act.

Taken out of context, this language appears pertinent. A full reading of the International Paper case discloses, however, that the issue in that case was quite different from that presented here. The question decided in International Paper was whether the Commission's adoption of a curtailment plan would ipso facto immunize the pipe line from liability for breach of service contracts. In other words, would a pipe line be liable to its customers for non-delivery if acting in compliance with a valid Commission order which contains no express findings regarding contractual liability. The court concluded that such an order would not be an absolute defense absent express findings with respect to contractual liability. 476 F.2d at 125. Hence, the twin findings mentioned in the International Paper opinion are only required for the purpose of exonerating a pipe line from liability for breaches of contract which may result

---

13. Opinion No. 634, ¶ 4, J.A. at 135.

from compliance with Commission orders.[14] The petitions now before us do not concern the remedial rights of the pipe line and its customers *inter sese,* but the authority of the Commission to override a contractually arranged curtailment plan. On the latter question, the statute leaves no doubt. The only preliminary finding required by the statute is that the former plan was discriminatory, a finding clearly expressed in Opinion 634.[15]

## C. *The End Use Method*

As explained above, the plan adopted in Opinion 634 establishes a schedule of priorities to be followed in allocating gas service curtailments. The differentiating factor among these priorities is "end use." Thus, the Commission has determined that certain uses of gas (e. g. use by residential and small commercial customers) should have a higher priority than others (e. g. use as boiler fuel). In the event of a shortage, customers purchasing gas for inferior uses will be completely cut off before any service to higher-priority customers is curtailed. Several parties take issue with the Commission's treatment of boiler fuel uses in this scheme. Their objections are discussed below at part V, C. For the moment we wish to take up the contention of petitioner City of Willcox that the Commission "exceeded its statutory powers by prescribing service priorities based upon the nature of end use by ultimate consumers." [16] Unlike those who merely object to the Commission's treatment of boiler fuel uses, Willcox asserts that the entire scheme of end use priorities is illegal. We disagree.

Willcox' attack on the Commission's authority is twofold. Its first contention is that end use is an improper criterion. The authorities relied upon by Willcox are inapposite, however. In Fuels Research Council, Inc. v. FPC, 374 F.2d 842 (7th Cir. 1967), the court approved a two-part rate structure which allocated costs among peak season customers and off-peak customers. A dissatisfied customer complained that the rate structure in question would encourage "inferior" uses of natural gas. The court replied that the Commission "is not authorized to consider the end use of natural gas in a *rate proceeding* [citation omitted] as distinguished from a certificate proceeding under section 7 of the Act." *Id.* at 854 (emphasis added). The decision does not prohibit consideration of end use in a curtailment proceeding.

Public Service Commission of State of New York v. FPC, 149 U.S.App.D.C. 421, 463 F.2d 824 (1972), also cited by Willcox, involved the Commission's certification of a proposed sale of natural gas for use in an oil refinery. The New York Public Service Commission sought review, arguing that the contemplated use was inferior to use by interstate residential and commercial customers. We remanded the case to the Commission for consideration of that objection.[17] The Commission sustained itself and the New York Commission again sought review. We affirmed the Commission, concluding: " . . . it cannot be said that 'a balance of *all* the circumstances' weights against granting the certificate here." *Id.* at 829–830. It is important to note, however, that we did not disapprove consideration of end use in certification proceedings:

In different certificate applications the factor of end use will have varying importance. In the case at bar the end use factor is not, by itself, of decisive importance. While it may be

14. We express no opinion as to the correctness of the *International Paper* decision, which suggests that a pipeline whose own shortsightedness or overreaching necessitates a curtailment plan should not be immune from contractual liability. 476 F.2d at 126 n. 5.

15. J.A. at 136–37.

16. Br. at 48 *et seq.*

17. Public Service Commission of State of New York v. FPC, 141 U.S.App.D.C. 174, 436 F.2d 904 (1970).

true that as to the particular natural gas involved, it would be desirable to have this gas go into the hands of residential rather than industrial users, there is no assurance that this would happen if the certificate were not granted.

*Id.* at 826.

■ Willcox' second objection to the end use method is that the plan effects a "reallocation" of gas supplies in violation of section 7(a). Willcox relies upon FPC v. Transcontinental Gas Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). In that case the Supreme Court was called upon to review the Commission's refusal to approve a contract for the sale of natural gas to be used as boiler fuel. The Commission denied certification on grounds, *inter alia*, that the proposed use of the gas was inferior to residential needs. The Court *approved* the Commission's action, stating that end use was a proper consideration in disapproving the contemplated sale. 365 U.S. at 22, 81 S.Ct. 435. Although this holding endorses the Commission's consideration of end use, the Willcox brief directs our attention to the following admonition of the court:

> [I]t must be realized that the Commission's powers under § 7 are, by definition, limited. [Citation omitted.] The Commission cannot order a natural gas company to sell gas to users that it favors; it can only exercise a veto power over proposed transportation and it can only do this when a balance of *all* the circumstances weighs against certification.

*Id.* at 17, 81 S.Ct. at 444. We reiterated that admonition in Granite City Steel Co. v. FPC, 115 U.S. App.D.C. 392, 320 F.2d 711 (1963), also cited in the Willcox brief, when we disapproved the Commission's wholesale reallocation of pipe line capacity from industrial users to public utility customers. Neither that ruling nor the dictum of the Supreme Court quoted above is in point, however. Both opinions were concerned with section 7(a) which prohibits the Commission from compelling a natural gas company to sell natural gas when to do so would impair service to existing customers. As we stated in *Granite City*:

> The theory and purpose of the statutory restriction appear to be that persons desiring gas *for the first time*, or desiring *more* gas, should not get it by taking it away from existing lawful customers.

320 F.2d at 713 (emphasis added). Quite clearly, this statutory restriction is not infringed by a curtailment plan based on end use. The curtailment plan does not order the sale of additional gas to one customer to the detriment of another. Rather, it prescribes a formula for allocating insufficient supplies among existing customers. We are not unmindful of Willcox' argument that *the effect* of the interim plan under review is the same as an order reallocating gas supplies from one customer to another, since the former curtailment plan would have protected the California customers from service curtailments. Even if this is true, however, we do not think the statutory prohibition applies to curtailment plans. Section 7(a) is plainly intended to regulate *expansions* of service. The prohibitory proviso we have been discussing must be read in that context. If this clause is construed to forbid approval of any curtailment plan which effects a shifting of the burden of future gas shortages, then the Commission would be powerless to regulate curtailments. Such a result would obviously be at odds with the Supreme Court's holding in *Louisiana Power & Light, supra*.

We conclude, therefore, that the curtailment plan now under review does not violate the section 7(a) prohibition against reallocation of gas service and is not inconsistent with previous decisions regarding the propriety of end use criteria in the regulation of the natural gas industry. Indeed, we think end use is a most appropriate consideration for purposes of a curtailment plan.

## IV. THE COMMISSION'S FINDINGS OF FACT

Several of the parties maintain that certain of the Commission's fact findings are not adequately supported by the evidence. The standard of our review in such matters is defined by the Natural Gas Act, section 19(b):

The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.

### A. *Findings Regarding The Former Plan*

In Opinion No. 634 the Commission found that, under tariff provisions then in effect, El Paso's California customers would be protected from service curtailments until all service to EOC customers had been completely cut off. As a result, the Commission found, human needs customers (residential and small commercial customers) in one part of the El Paso system would be subordinate to industrial customers in another part in the event of a severe gas shortage. That the Commission's concern was more than merely theoretical is apparent from the following statement:

The supply evidence introduced by El Paso at the reopened proceeding clearly indicated that there was a real probability that curtailments under its presently effective tariff would result in cutting off not only commercial customers east of California but residential customers also, while California would probably be curtailed not at all.

J.A. at 137. Based upon these findings, the Commission concluded that the curtailment provisions of El Paso's tariff were discriminatory under sections 4 and 5 of the Natural Gas Act.

We think the Commission's findings as to the effect of El Paso's former curtailment plan are, for the most part, sustained by substantial evidence in the record. Exhibit 237 [18] before the Commission indicates that, under the former plan, EOC customers would have borne the entire burden of estimated curtailments for the twelve-month period commencing on November 1, 1972, while service to California remained undisturbed. On a peak day, deliveries to EOC distributors for resale to residential and commercial customers would have been curtailed by about 25%, according to the estimate, and EOC direct industrial customers would have been completely shut off.[19] In addition, there would have been some amount of EOC curtailment on virtually every other day of the year.[20] This evidence was summarized by one of El Paso's witnesses at the hearings:

Q. And what conclusion do you draw from, or would you have us draw from, the showings made in [Exhibit 237, Schedule 1]?

A. I can tell you what conclusions I draw from the information shown there, and that is significant curtailment of the customers east of California, of the commercial and residential component of the requirements on a peak day, and full service to California, and significant industrial and irrigation curtailments to the east of California customers on the average days throughout the year, while full service is being rendered to the California customers by El Paso.

J.A. at 542. Several petitioners challenge these estimates, stating that supplies have been underestimated and peak day demands exaggerated. The maximum demand estimate is, in fact, based upon a hypothetical coincidence of peak demand days throughout the El Paso

---

18. "Summary of Estimated Monthly Mainline Requirements, Curtailment and Sales for the Period November 1, 1972 through October 31, 1973 Based on El Paso's Currently Effective Tariff," Prepared by El Paso Natural Gas Co., J.A. at 651 *et seq.*

19. J.A. at 477 (Testimony of M. K. O'Toole of El Paso Natural Gas Co.).

20. Exhibit 237, Schedule 1, pp. 14–17, J.A. at 665–68; J.A. at 477 (Testimony of M. K. O'Toole of El Paso Natural Gas Co.).

system.[21] Such an eventuality is so improbable, it is argued, that there is no substantial evidence to support the Commission's forecast of commercial and residential curtailments east of California. We think that the evidence supports the Commission. There was credible testimony that the weather conditions required for a systemwide coincidence of peak demand had in fact occurred in the past and were likely to occur again.[22] Moreover, the forecasting of demand for natural gas is a matter within the peculiar expertise of the Commission and cannot lightly be upset by a reviewing court.

The estimated supply figures presented by El Paso are questioned because they fail to include two sources of gas. The first of these is withdrawal of gas from certain wells in excess of amounts allowed by various state regulatory authorities. There was reliable testimony, however, to the effect that "exceeding allowables" is a short-term emergency measure involving potential adverse effects upon supplies in the future.[23] The Commission was not required to insist that this resource be exhausted before it could conclude that EOC commercial and residential customers were in danger of curtailment. The second source of gas not included in the supply estimate is gas which would be made available through curtailment of "field sales." Even taking into account curtailment of field sales, however, it is clear that severe curtailment of EOC customers would have persisted. The proposed curtailment of field sales could only provide an additional 69,000 Mcf of gas to offset peak day curtailments of EOC

residential-commercial service which were expected to reach 226,000 Mcf.[24]

In short, we think the Commission's prediction of severe EOC curtailments under the former plan is supported by substantial evidence. We note, however, that the testimony does not distinguish between commercial and residential service for purposes of estimating peak day demands. Exhibit 237 merely contains figures representing aggregate peak day curtailments of both commercial and residential EOC customers which could have been anticipated under the former plan.[25] There is no indication that residential customers would actually have been curtailed at all.[26] It is possible that the estimated 25% cutback of residential-commercial service would have been completely absorbed by the commercial sector. Consequently, there is no substantial evidence to sustain the finding that EOC residents would "probably" or "undoubtedly" have been curtailed under the old plan. On the other hand, the evidence does sustain the conclusion that peak day curtailment would, at minimum, cause the complete shutdown of EOC direct industrials and substantial reduction of service to EOC commercial customers while California service remained undisturbed. We think the latter findings form a sufficient basis for the Commission's actions to the extent we affirm them in this opinion. We recognize, of course, that the Commission might have followed a different course of action had it not incorrectly concluded that EOC residential customers would "undoubtedly" be curtailed under El Paso's previous tariff provisions. Upon remand, the Commission is free to

21. J.A. at 475.

22. J.A. at 477, 540–41, 546, 554 (Testimony of M. K. O'Toole of El Paso Natural Gas Co.).

23. J.A. at 568–69, 572 (Testimony of A. M. Derrick of El Paso Natural Gas Co.).

24. Exhibit 237, Schedule 1, pp. 1–14, 18, J.A. 651–65, 669.

25. Testimony indicates that separate estimates of residential and commercial needs on a peak day were not available to El Paso. J.A. at 545 (Testimony of M. K. O'Toole of El Paso Natural Gas Co.).

26. El Paso's witness conceded that he could not predict residential curtailment on an *average* day, as opposed to a peak day. J.A. at 545.

modify its orders accordingly, subject to further review by this court.

## B. *Findings Regarding "Grouping"*

"Grouping", or "conjunctive billing" as it is sometimes called,[27] is a practice whereby a customer having more than one delivery point on a pipeline is permitted to take delivery of its gas entitlements at whichever delivery points and in whatever proportions it chooses. Because this practice was not mentioned in Opinion 634, El Paso requested clarification of the Commission's position with respect to grouping. The Commission responded in Opinion 634–A as follows:

> [W]e find that the imposition of conjunctive billing as proposed by El Paso is not justified at this time, and could well result in increased industrial gas usage by those customers having a number of delivery points. Certainly it could result in discrimination against those customers, including California, who have only one delivery point.

J.A. 241. Southern Union Gas Co. ("Union") objects to this prohibition against grouping. Union is a gas distribution company with many relatively small distribution systems scattered along El Paso's Southern Division System. Each of Union's systems connects with the El Paso line but they are not otherwise interconnected. Prior to the Commission's prohibition against grouping, service curtailments to Union were computed on a systemwide basis. Thus, if a 30% curtailment of priority 5 gas were in effect on a given day, Union would be curtailed by a volume equal to 30% of the total of its priority 5 entitlements. The effect of Opinion 634–A is that curtailments to Union must now be computed separately for each delivery point. Mathematically, the result would

appear to be the same, but as the testimony of Union's Vice-President points out, there is a significant difference:

> A. The best way to explain it probably would be to take the case of a delivery point from El Paso to Southern Union through which only one industrial customer is served. We have, in fact, several such situations. Let's assume this is a Priority 4 customer with a daily requirement of 1,000 Mcf, and that during a particular 10-day period El Paso is curtailing its Priority 4 deliveries an average of 30 percent each day. In that situation, as El Paso is interpreting Opinion No. 634–A, Southern Union cannot receive for redelivery to this customer more than 700 Mcf on any one day. And right there is where we run into trouble, because many of our industrial customers cannot, as a practical matter, continue operating their facilities if their gas supply is subject to any significant curtailment. So far as gas usage is concerned, they are either completely on or completely off.

J.A. 582–83 (Testimony of Oran L. Haseltine). The grouping method would permit Union to deliver gas to its on-or-off customers in such a way that none would be curtailed more than necessary and systemwide curtailment of Union would be on a level equal with other El Paso customers. Thus, if a 30% curtailment of priority 4 customers were in effect for a ten-day period:

> [W]e could provide the customer with his full requirements on seven days and cut him off completely for three. This, over the full 10-day period, would give him merely the same 7,000 Mcf in the aggregate which we have assumed to be his entitlement. Instead of effectively shutting him down for the entire 10 day period simply because he cannot operate on only 700 Mcf per day, we would have enabled

---

27. We note that these terms are not necessarily synonymous. *See* Decision of Administrative Law Judge on Grouping of Delivery

Points at 1 (September 19, 1973). (This decision approves grouping for purposes of the permanent plan.)

him to continue operating 70 percent of the time.

. . . .

By staggering the days of cut-off among them, we obviously should be able to put all of them on the same sort of three-days-off, seven-days-on schedule I've been talking about, and still overall not be delivering more gas to them on any day than the aggregate of its individual allotments of gas for that purpose; none of El Paso's other customers would suffer any resultant decrease in service.

*Id.* at 586–87. We are not called upon here to judge the merits of the grouping technique. The testimony set out above is cited only for the purpose of explanation. The question before us now is whether the Commission acted arbitrarily in prohibiting this practice. Union argues that there is no evidence of record to support the Commission's finding that grouping of delivery points "could result in discrimination against those customers, including California, who have only one delivery point." The Commission's brief fails to point out any such evidence and, at oral argument, counsel conceded that there was none:

QUESTION: Well, couldn't we find that there was no substantial evidence supporting the grouping decision and just excise that out of the order?

MR. McHENRY: Your Honor, there is no substantial evidence supporting the position taken by Southern Union on this record that it should necessarily have grouping. This was just—

QUESTION: Is there any evidence to the contrary?

MR. McHENRY: I don't believe there is evidence to the contrary, either way or the other, on this record, your Honor.

Tr. at 44. The Commission suggests that its action was justified because Union failed to raise the issue at hearings

on the interim plan. It is clear, however, that the burden is upon the Commission to show that substantial evidence sustains its finding that grouping of delivery points would be discriminatory. There is no indication that the question was ever considered until El Paso requested clarification of the Commission's original order, Opinion No. 634. Indeed, testimony before the Commission strongly suggests that it was understood by all parties that grouping would be permitted.[28] We conclude, therefore, that the Commission's findings with respect to grouping are not supported by substantial evidence. The Commission's Opinion No. 634–A must be reversed to the extent that it prohibits grouping of delivery points by El Paso's customers, and remanded for further fact findings.

## V. THE COMMISSION'S CONCLUSIONS OF LAW

At this point it may be helpful, for purposes of our analysis, to restate the source of the Commission's authority to prescribe an interim curtailment plan:

Whenever the Commission . . . shall find that any rate, charge, or classification . . . or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order . . . .

Natural Gas Act, section 5(a). The Commission's exercise of its authority under this statute is a two-step adjudicatory process: first, the Commission must find that an existing condition is unjust or discriminatory; second, the Commission must prescribe the remedy for that condition. Each step requires

---

28. J.A. at 550 (Testimony of M. K. O'Toole of El Paso Natural Gas Co.), 576 (Testimony of James M. Kiely, Jr. of the FPC staff).

the Commission to draw a legal conclusion, *viz.*: the illegality of an existing condition and the justness and reasonableness of the remedy. In the present case, the Commission has found that El Paso's former curtailment procedures are "discriminatory under sections 4 and 5 of the Natural Gas Act" and that the temporary curtailment plan promulgated in Opinion 634 is "reasonable, necessary, appropriate and in the public interest." Our reviewing function with respect to such conclusions of law is somewhat different from that applied to the Commission's findings of fact. This difference was pointed out in the concurring opinion of Chief Judge Stephens in Capital Transit Co. v. Public Utilities Commission, 93 U.S.App.D.C. 194, 213 F.2d 176, 187, cert. denied, 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 643 (1954):

> The decisions require a commission in a quasi-judicial proceeding to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings—this in order that the commission shall itself perform the initial function of evaluating the evidence and deciding the issues of fact, and in order that the courts, as reviewing tribunals, can decide whether or not the ultimate decision reached by the commission follows as a matter of law from the facts found as its basis, and also whether or not the facts found have substantial support in the evidence.

*See also* Saginaw Broadcasting Co. v. FCC, 68 U.S.App.D.C. 282, 96 F.2d 554, 559, cert. denied, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938); In re United Corp., 249 F.2d 168, 179–180 (3rd Cir. 1957); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 850 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). The Commission's action must be sustained if it is reasonable in light of the basic fact-findings and the record evidence. In the matter now before us, a number of the parties challenge the reasonableness of the Commission's action. This part of the opinion will consider those objections.

### A. *"Pre-existing Curtailment"*

Petitioners Southern California Edison Co. and the Department of Water and Power of the City of Los Angeles (hereafter referred to collectively as "Edison") argue that the Commission's action is unreasonable in light of the gas supply shortages being experienced in the California market.[29] The Southern California Gas Company (SoCal) and the San Diego Gas and Electric Company (San Diego) also complain that the Commission has ignored the shortages in California. The position of SoCal and San Diego is that the Commission should have taken the alleged California shortages into account in formulating the interim plan. Edison, on the other hand, argues that, had the Commission considered these shortages, the former plan would not have been found to be discriminatory.

Edison's argument must fail. The Commission properly found, based upon substantial record evidence, that the former curtailment plan would have required complete cutoff of EOC customers prior to any curtailment by El Paso of its service to California customers.[30] Based upon this finding it was reasonable for the Commission to conclude that the former tariff provisions governing curtailment were discriminatory, regardless of the shortages wich plague California.

SoCal and San Diego raise a more difficult question, namely: was it reasonable for the Commission to issue an interim curtailment plan which fails to take into account pre-existing gas shortages in California? In our opinion the

---

29. For purposes of clarity, we do not follow Edison's practice of referring to these shortages as "pre-existing curtailment." In fact, there had never been any curtailment of El Paso's service to its California customers prior to adoption of the interim plan. J.A. at 340, 344, 353 (Testimony of Mr. Travis Petty of El Paso Natural Gas Co.).

30. See the discussion at part IV A, *supra.*

answer is yes. Admittedly, the Commission's opinions are devoid of any mention of recent supply shortages in California, although the record contains testimony on the matter.[31] The opinions call for ratable curtailment of all customers without any adjustments which might lighten the burden of curtailment for customers · already experiencing shortages. These facts strongly suggest that the Commission ignored the California supply problem when it formulated the interim plan. If the Commission had promulgated a *permanent* curtailment plan under these circumstances, failure to consider the pre-existing shortages in California and to enunciate findings with respect to that situation would almost certainly have been fatal. The orders under review are *interim* orders, however. On review, the court must take into account the temporary nature of the Commission's action as well as the exigencies which prompted the Commission to grant interim relief. An interim order is not arbitrary simply because it fails to resolve all issues raised in the proceeding.

In the present case, we think the Commission's action was reasonable. Once having determined that the existing curtailment procedures were discriminatory, the Commission was faced with the choice of allowing them to remain in effect pending issuance of a permanent order, or instituting a temporary plan which would cure at least the more severe defects of the illegal plan. The main purpose of the interim plan was to avert the danger that EOC residential users might be curtailed during the winter of 1972–73. The pre-existing shortages in California add complex problems, the resolution of which the Commission properly deferred until the issuance of a final order.

Our approval of the Commission's action is obviously based upon the assumption that it has merely deferred consideration of California market conditions and that this factor will be taken into account in the formulation of the permanent plan. Ideally, such an intention should be expressed in the agency's interim order, so that the reviewing court is not left to guess at its reasoning. Upon remand, therefore, we invite the Commission to incorporate into its interim order a full statement of its reasons for postponing the resolution of issues arising from the California gas shortage.

### B. *Withdrawals From Storage*

In computing the curtailment to be apportioned to each of its customers on a particular day, El Paso is required to use a formula set forth in section 11.3(b)(i) of its revised tariff, which we paraphrase as follows:

$$\frac{\text{Customer's Needs}}{\text{Systemwide Needs}} = \frac{\text{Customer's Share}}{\text{Available Supply}}$$

J. A. at 347 (Testimony of M. A. Erlich). Because California customers rely on El Paso for only part of their gas supply, only part of their needs are counted for purposes of this formula. The proper proportion is determined by the ratio of scheduled deliveries from El Paso to total scheduled deliveries from all sources. If, for example, only one-half of the California customer's supply for the day is scheduled to be provided by El Paso, then only one-half that customer's requirements are counted for purposes of computing its share of the shortened El Paso supply. The basic formula set out above quickly discloses the effect of such a reduction of the "needs" figure: it reduces the customer's share of the El Paso supply.

The California customers do not challenge the basic fairness of this scheme, but they strongly object to the treatment of stored gas as an independent source of supply, because at least some of the gas withdrawn from storage on a particular day will be traceable to previous purchases from El Paso. Treating this gas as an independent supply, it is argued, results in an underestimation of El Paso's share of the total California

---

31: J.A. at 529–31 (Testimony of John C. Abram of Southern California Gas Co.).

market. This in turn causes excessive curtailment of California customers by El Paso. Apparently recognizing this problem, the Commission staff recommended an adjustment to the curtailment formula.[32] The Commission declined to include the adjustment in the interim plan, however, stating that it would add an "additional complication."[33] We do not think this brief and conclusory statement is sufficient to sustain the Commission's rejection of the staff proposal. As we stated in our discussion of "pre-existing curtailment" *supra,* problems which greatly complicate the Commission's work may properly be deferred if prompt interim action is necessary. In this instance, however, the staff had apparently been able to devise a solution for use under the interim plan. There is no suggestion that the proposed storage adjustment formula would impede implementation of the interim plan. The mere fact that the solution is complicated cannot justify the Commission in refusing to provide just and reasonable interim curtailment procedures. We therefore remand this matter to the Commission for further consideration of the proposed storage adjustment formula.

■ One further question was raised in the briefs concerning the Commission's treatment of withdrawals from storage. SoCal takes the position that no part of such withdrawals should be counted as a source of supply for purposes of curtailment. To do otherwise, it is argued, will discourage the development of gas storage facilities. This prediction is convincingly disputed by testimony in the record.[34] Even if SoCal is correct, however, an otherwise just and reasonable determination of the storage

issue is not invalid merely because it might be a disincentive to the storage of gas. The development of storage facilities is an ancillary policy consideration committed to the discretion of the Commission. The failure of a particular proposal to conform in all respects to established policies of natural gas regulation does not necessarily preclude Commission approval of the proposal.[35]

### C. *Shift of Industrial Gas*

■ Perhaps the most strenuous objections of the California customers to the temporary plan are directed toward its effect on the allocation of gas for industrial uses. As explained above, the old curtailment plan placed every EOC customer in a priority subordinate to all California customers. In the event of a gas shortage, the California customers would have been the last to suffer any curtailment. Since the temporary plan is based upon categories of end use, however, the California customers must now share ratably any curtailment which becomes necessary. As a result, EOC industrial users will suffer less immediate curtailment than under the old plan and the California industrial users will suffer more. This effect is referred to by the California customers as a "shift" of industrial gas from California to EOC users. They complain that this measure is not warranted by the "emergency" and not necessary for the protection of EOC human needs customers.[36] This contention plainly misapprehends the basis and scope of the Commission's action.

In Opinion 634 the Commission clearly found that the former curtailment plan was discriminatory *in toto*, not just in

32. J.A. at 483 (Testimony of James M. Kiely, Jr. of the FPC staff).

33. Opinion 634, ¶ 12, J.A. at 141.

34. J.A. at 346–49 (Testimony of M. A. Erlich of El Paso Natural Gas Co.).

35. For similar reasons, we do not think arguments addressed to the economic impact of the interim plan (SoCal Br. at 20; PG&E Br. at 17; San Diego Br. at 31), its

effect on the development of alternate fuel facilities (PG&E Br. at 21) and the availability of "less disruptive" plans (SoCal Br. at 24) require reversal of the Commission's interim order. Of course any of these factors may take on greater significance for purposes of a permanent curtailment plan.

36. Tr. at 24; SoCal Br. at 13; PG&E Br. at 13 *et seq.*; Edison Br. at 20–22; San Diego Br. at 7–8, 20–23.

its effect upon EOC human needs customers:

Under [the former] tariff provision no curtailment would take place to California customers until all EOC service had been curtailed. This means that both residential and commercial customers east of California would be cut off before any service to California was cut off. Almost all of the parties concede that under the present circumstances this would patently discriminate against the EOC customers. The supply evidence introduced by El Paso at the reopened proceeding clearly indicated that there was a real probability that curtailments under its presently effective tariff would result in cutting off not only commercial customers east of California but residential customers also, while California probably would be curtailed not at all. It is obvious that we would be negligent in our duties if we allowed human needs customers on any portion of the system to be cut off while industrial customers were still receiving gas on another portion of the system. We find that the currently effective plan of El Paso, is discriminatory and violative of Section 4(b) of the Natural Gas Act.

J.A. at 136–37. Concededly, the Commission placed great emphasis upon the most eggregious faults of the former plan, i. e. its effect upon EOC residential and small commercial customers. But the key findings of the Commission refer to EOC customers generally: the former curtailment plan "would patently discriminate against the EOC customers" because ". . . no curtailment would take place to California customers until all EOC service had been curtailed." Since we have already concluded that these findings are sustained by substantial evidence (part IV A), the only remaining question is whether the temporary plan is arbitrary in its treatment of industrial users in California. We think not. The ratable curtailment of industrial users in order to protect supplies to Priority 1 and Priority 2 customers is a reasonable interim course of action in light of the Commission's findings. Although it might not be the sole solution or the best solution, it is certainly within the range of conclusions which might be reached by reasoned decision making. A separate question arises regarding the Commission's disparate treatment of boiler fuel users as opposed to other industrial customers. This is treated in the following section.

D. *Boiler Fuel Uses*

Under the Commission's interim curtailment plan, the lowest two priorities (Priority 4 and Priority 5) are assigned to customers who use natural gas as boiler fuel when alternate fuel facilities are present. (The only difference between Priority 4 and Priority 5 is the daily volume involved.) Such customers will be the first to experience curtailment in the event of a gas shortage and service to them will be completely terminated before any curtailment of service to higher priority customers, including industrial customers applying gas to uses other than as fuel for boilers. Several of the parties argue that this treatment of boiler fuel uses is unreasonable [37] and not supported by substantial evidence.[38] It is also contended that the Commission failed to articulate its reasons for assigning the lowest priority to boiler fuel uses.[39] We think the last contention is dispositive.

 A search of the two opinions under review reveals no specific findings or reasoning in support of the Commission's decision to assign boiler fuel uses of gas to the lowest priority. As we have stated many times in the

---

37. PG&E Br. at 20–22; Brief of Intervenor State of California at 7–8.

38. Edison Br. at 33–35; Willcox Br. at 5–6.

39. PG&E Reply Brief at 10; Willcox Br. at 55.

past, the failure of an administrative agency to articulate the reasons for a particular decision makes meaningful review of that decision impossible. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S. Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). Upon remand of this proceeding, the Commission is directed to make findings concerning the curtailment priority appropriate for boiler uses and to state the reasons for its determination.

The Government suggests that it was not necessary for the Commission to state its reasoning in this matter because the determination is supported by established Commission policy and precedent. We requested supplemental briefing on this point by our Order of October 31, 1973, which posed the following question:

> Is there established Commission policy and precedent which will sustain the Commission's further finding (2) of Opinion No. 634 subordinating certain boiler fuel uses to all other uses?

We conclude that this question must be answered in the negative.

 While it is true that the Commission has for a long time considered the use of natural gas as boiler fuel to be "inferior" to other uses,[40] it is clear from the decisions of the Commission that this policy has never been conclusive. Rather it is but one factor to be considered in making a regulatory decision affecting boiler fuel use. The Commission itself recently recited a litany of cases in which the use of natural gas as boiler fuel had been approved:

> Commission policy in the past has not been to deny boiler fuel sales, but to authorize them where they served some public advantage. Texas Gas Transmission Corp., 12 FPC 658 (1953); Transcontinental Gas Pipe Line Corp., 11 FPC 615 (1952); Northern Natural Gas Company

(Black Dog), 29 FPC 1025 (1963); Michigan Wisconsin Pipe Line Company, 32 FPC 737 (1964). In the *Transcontinental* case the Commission authorized the sale of interruptible gas to Duke Power Company for boiler fuel where it was shown that Transco would obtain additional revenues without substantial operating cost. In the *Northern Natural* case the Commission approved a sale of natural gas for resale for boiler fuel where the sale was contemplated in a settlement of Northern's rates and was therefore beneficial to Northern's customers. In the *Michigan Wisconsin* case the Commission authorized the direct sale of gas to a power company for boiler fuel use where there would be a fuel saving to the power company and a resulting rate reduction by Michigan Wisconsin.

. . . .

In our opinion, while we have termed boiler fuel use inferior in the past, at present it cannot necessarily be so termed because of the air pollution problem. In Transcontinental Gas Pipe Line Corp., 38 FPC 906 (1967), the Commission approved delivery of additional firm gas to Con Ed for boiler fuel use noting among other things that is [*sic*] would be an affirmative step in dealing with the air pollution problem.

Chandeleur Pipe Line Co., 44 FPC 1747, 1756 (1970). A subsequent opinion in the same case stated that "there is no superior or inferior use of natural gas *per se*; it depends upon the circumstances." Chandeleur Pipe Line Co., 45 FPC 370, 371 (1971). Thus, the Commission's policy disfavoring the use of natural gas as boiler fuel can be outweighed by other considerations arising in a particular case. Our duty in this case is not to weigh the anti-boiler fuel policy against other factors, but to point out that such a balancing process must take place. The Commission's own re-

---

40. *See, e. g.,* Federal Power Commission Annual Report (1940) at 79.

cent statement of policy regarding curtailment priorities acknowledges as much:

> When applied in specific cases, opportunity will be afforded interested parties to challenge or support this policy through factual or legal presentation as may be appropriate in the circumstances presented.

FPC Order No. 467 at 1 (January 8, 1973).[41] The opinions now under review give no indication whether such an opportunity was provided or such a weighing of interests was conducted. In asking us to sustain its decision, the Commission is really asking us to hold that boiler fuel uses of natural gas are *per se* inferior to all other uses, for purposes of curtailment, regardless of the particular circumstances. As we said in Public Service Commission of State of New York v. FPC, 149 U.S.App.D.C. 421, 463 F.2d 824, 826 (1972), we are not prepared to so hold, and will not do so in the absence of a proper and definitive determination by the Commission that such is the case.

### E. *Volumetric Limits*

 Following the issuance of Opinion 634, El Paso filed tariff revisions intended to implement the Commission's order. Section 11(j) of the revised tariff, which was approved by Opinion 634–A, establishes limits upon the amounts of gas El Paso's customers will be entitled to purchase while the interim order is in effect. There is both a daily limitation and a periodic limitation, i. e. a limit on the total amount of gas which may be purchased while the interim plan is in effect. For convenience, we shall refer to this latter limit as the annual limit. The daily limit is set at the maximum daily delivery obligation of El Paso under its contract with each customer. The annual limit is computed in either of two ways: (1) the limit for a customer who purchases his entire gas supply from El Paso (a "full requirements" customer) is the quantity actually received by that customer between July 1, 1971 and June 30, 1972 (plus any curtailment experienced during that period); (2) the limit for a customer who purchases only part of his gas supply from El Paso (a "partial requirements" customer) is a quantity equal to his maximum daily contract entitlement multiplied by the number of days in the year. Since the EOC customers are full requirements customers, the annual limit on their gas entitlements is measured under the first rule. The maximum annual entitlements of the two California customers (PG&E and SoCal) are measured under the second rule, however, because they are partial requirements customers.

Petitioner American Smelting and Refining Co. (Asarco) contends that the effect of this dual standard is that the California customers will be permitted to purchase volumes of gas in excess of the amounts delivered to them in the past whereas Asarco and other EOC customers are limited to their historic takes.[42] In Asarco's view, such divergent treatment of these two classes of customers is discriminatory. The Commission, which devotes only a single footnote in its brief to the question, states simply that "[t]his treatment was reasonable and certainly within the Commission's discretion."[43]

41. This order was modified by orders 467–A (January 15, 1973) and 467–B (March 2, 1973). The latter order contains the following statement: ". . . Order No. 467 is a policy statement and is not intended to initiate a proceeding or to provide a binding rule without further proceedings directed towards curtailment problems on specific pipelines."

42. Although this result is not readily apparent, recent modifications of SoCal's contract with El Paso together with past transfers of gas between PG&E and SoCal make it possible. Asarco Br. at 41–43. The Commission apparently admits this in its brief at 52 n. 54.

43. *Id.*

We are unable to decide whether the Commission's action was reasonable or discriminatory because the Commission has not stated its reasons for adopting this dual annual limitation formula. The Commission's original order (Opinion 634) did not discuss or prescribe annual limitations. Opinion 634–A, which approved the El Paso tariff revision incorporating the formula, does no more than state that the annual limitations are consistent with those proposed by the Commission staff at the hearing.[44] In a subsequent order clarifying Opinion 634–A, the Commission shed little additional light upon the reason for its decision:

> East of California (EOC) customers are limited to annual takes during the twelve-month period ending June 30, 1972. This was provided for inasmuch as the existing contracts for EOC customers do not provide for annual limitations.

Order of February 7, 1973, J.A. at 334. While this does explain the need for a tariff provision restricting annual consumption by EOC customers, it does not explain why these customers should be restricted on a different basis than the California customers. We must therefore remand this matter in order to provide the Commission with an opportunity to make further findings and to state the reasons for its decision or any modification of that decision which may appear to be necessary.

### F. Penalties

 Asarco also objects to the Commission's deletion of overrun penalties from the revised tariff filed by El Paso in response to Opinion 634.[45] These penalties are apparently intended to discourage El Paso's customers from taking amounts of gas in excess of their maximum daily allotment under the interim plan. In Opinion 634–A, the Commission removed the penalty provisions, stating:

> With regard to penalties for unauthorized overruns, we note that El Paso has never had them in its tariff and we do not consider it appropriate to institute them in an interim proceeding. As we also noted above, a number of customers have not recently revised their contracts and have been making substantial overruns for the use of human needs customers. While some provisions for preventing unauthorized overruns may well be necessary in a permanent curtailment plan, we do not believe we should prescribe one at this time.

J.A. at 242. The Commission's concern for human needs customers is clearly unnecessary. The stricken penalty provision carefully defined the term "unauthorized overruns" to exclude overruns taken for the purpose of fulfilling residential and small commercial requirements.[46] Consequently, the Commission's action cannot be sustained upon the stated reasoning.

We note that the passage quoted above makes vague reference to El Paso's past practices regarding penalties and to the "inappropriateness" of instituting such penalties in an interim plan. It is possible that these references were intended to state additional reasons for rejection of the penalty provisions. If so, we are of the opinion that such grounds are not sufficiently articulated so as to permit meaningful review here. This matter is remanded to the Commission, therefore, for further clarification of its reasons for deleting the penalty provisions of the El Paso tariff.

### VI. ENVIRONMENTAL IMPACT

 The National Environmental Policy Act (NEPA) requires that, "to

---

44. J.A. at 242.

45. See § 20 of the Revised Tariff, J.A. at 233–34.

46. Id. § 20.2.

948

the fullest extent possible," each federal agency shall issue a statement detailing the environmental impact of any major action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C) (1970). Several parties in the present case take the position that the establishment of an interim curtailment plan is a major federal action requiring such an environmental impact statement. They charge that the Commission's failure to issue such a statement violates the statute. The Commission does not deny that Opinions 634 and 634–A constitute major federal actions, but contends that compliance with the Act was not "possible" within the meaning of the statutory phrase "to the fullest extent possible." The Commission acknowledges its duty to give a full accounting of the environmental impact upon issuance of its final permanent order. Its only contention here is that the same exigencies which prompted the issuance of an interim emergency curtailment plan prohibited full exploration of environmental problems prior to implementation of that plan.

This very question has been raised and decided in a similar case in the Fifth Circuit. In Atlanta Gas Light Co. v. FPC, 476 F.2d 142, 150 (5th Cir. 1973), the duties of the Commission under the Natural Gas Act were held to supercede the procedural dictates of NEPA:

The mandate of the NEPA on federal agencies is that they comply with the procedural duties imposed by the Act to the fullest extent possible. See Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n, D.C. Cir., 1971, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114–1115. As there noted, the legislative history of the NEPA interprets "to the fullest extent possible" to mean compliance unless compliance would give rise to a violation of statutory obligations. As Louisiana Power & Light Co., supra, makes clear, the Federal Power Commission has a statutory duty to the

public under the Natural Gas Act to take effective interim curtailment action in the exigencies presented by gas shortages. We cannot say that the NEPA suspends this duty of the Commission.

We think this reasoning is correct and dispositive. In the present case, the Commission's duty under the Natural Gas Act to prevent discriminatory practices in times of gas shortage called for prompt action. This created the type of "statutory conflict" which alone can excuse compliance with section 4332(2)(C). Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

Edison and SoCal attempt to distinguish Atlanta Gas on the ground that the time constraints at work in that case are absent here. Both parties note that in Atlanta Gas a revised tariff was filed in November 1971 indicating that immediate curtailment was required for the 1971–72 winter heating season. By contrast, El Paso's initial filing preceded issuance of the interim plan by some sixteen months, ample time for preparation of an environmental impact statement. This distinction is misleading. El Paso's original filing (July 6, 1971) which is still pending before the Commission, did not request interim action by the Commission. Rather, it contemplated the approval of a final permanent curtailment plan after full hearings. It was not until August of 1972 that El Paso requested an interim order regulating curtailments for the 1972–73 heating season, by then only a few months away.

■ Our discussion of this issue would not be complete without the following caveat. A federal agency which seeks to excuse itself from its duties under section 4332(2)(C) cannot do so by simply ignoring that statute. Rather, it must make express findings which demonstrate the "statutory conflict" which prohibits compliance. Cf. Calvert Cliffs' Coordinating Committee v. AEC supra, 449 F.2d at 1115; Scientists' Institute for Public Information, Inc. v. AEC, 156

U.S.App.D.C. 395, 481 F.2d 1079, 1094 (1973). Opinion 634, standing alone, does not meet this requirement. We think this defect is cured, however, by paragraph 10 of the clarifying opinion, No. 634–A.[47]

## VII. SUMMARY

We hold that the Commission has authority under section 5(a) of the Natural Gas Act to establish, by interim order, a temporary curtailment plan based upon end use. This authority is not restricted by contractual arrangements among pipeline companies and their customers. The Commission's finding that the former curtailment plan was discriminatory and its determination to postpone consideration of preexisting gas shortages in the California market and to subordinate industrial uses of gas to residential and commercial uses are affirmed. Its determinations with regard to grouping, storage withdrawals, boiler fuel uses, annual volumetric limits and penalties for overruns are reversed for the reasons stated in this opinion. We further hold that the Commission's failure to issue an environmental impact statement at the time the interim plan was established did not violate NEPA, 42 U.S.C. § 4332(2)(C). This matter is remanded to the Commission for further proceedings consistent with this opinion. In order to insure orderly administration of gas curtailments, the Commission may continue the interim order in effect for a reasonable period of time pending its decision regarding the matters remanded for further consideration.

So ordered.

FAHY, Senior Circuit Judge (concurring):

I concur except with respect to the scope of the remand. Upon my study of the record I conclude that the court should not disturb the Commission's interim plan regarding those parts thereof designated as follows in the court's opinion: (B) Withdrawals from Storage, (E) Volumetric Limits, and (F) Penalties. I would not require further consideration of these three subjects. In all other respects I concur in Judge Tamm's opinion for the court.

---

47. We note that over a year has passed since the implementation of the interim plan and that the plan has been extended indefinitely by the Commission's order of October 18, 1973. To the best of our knowledge, no environmental impact statement has yet been filed. It should be understood, however, that our ruling today is not a license for permanent or prolonged evasion of responsibilities under NEPA. If it becomes clear that the Commission's non-compliance is attributable to motives other than statutory impossibility, interested parties will not be barred by this opinion from seeking appropriate relief.